## Case No. 16,560.

### UNITED STATES v. TWENTY–EIGHT CASKS OF WINE.

[See Case No. 14,281.]

## Case No. 16,561.

### UNITED STATES v. TWENTY–EIGHT PACKAGES OF PINS.

[Gilp. 306.] 1

District Court, E. D. Pennsylvania. June 2, 1832, and Jan. 10, 1833.

PRACTICE—PRODUCTION OF BOOKS AND PAPERS—PROCEEDINGS IN REM—CUSTOMS DUTIES—UNDERVALUATION—INFORMATION OF FORFEITURE.

1. The affidavit of a party interested, taken without cross examination, is competent evidence on a motion for an order on the opposite party, to produce books and writings, under the provisions of the act of September 24, 1789 [1 Stat. 73].

2. A court of chancery, on a bill of discovery, will not compel a party to produce evidence which would subject him to a forfeiture.

3. A proceeding in rem is not within the provisions of the act of September 24, 1789, which authorise an order to produce books and writings, on the trial of actions at law.

[Cited in U. S. v. Distillery No. 28, Case No. 14,966.]

4. Where an information has been filed under the provisions of the act of May 28, 1830 [4 Stat. 409], against articles alleged to be falsely charged in an invoice, the court will not grant an order on the claimant to produce the invoice on the trial of the cause.

5. To subject goods to forfeiture for a false valuation in an invoice, it must have been produced at the custom house for the purposes of an entry.

6. To make up a false invoice at the place of exportation, with intent to defraud the revenue, is not an offence against the law, until followed up by an actual attempt to use it for the purposes of an entry.

7. The sole object of the laws of impost is the collection of the duties; they are not intended for the punishment of crimes.

On the 17th December, 1831, an information was filed by the attorney of the United States, against twenty-eight packages of pins imported in the ship Monongahela, from Liverpool, which were alleged to be forfeited, on the ground, that "the invoice thereof was made up with intent to evade and defraud the revenue," contrary to the provisions of the act of congress of May 28, 1830, relative to goods subject to ad valorem duty. Pamph. Laws 1830, p. 105. On the 17th January, 1832, William C. Cardwell and John Potter, for and on behalf of Kirby, Beard and Kirby, of London, filed a claim to the goods in question. They also denied the allegation that any invoice thereof was made up with intent to defraud the United States; and submitted,

1 [Reported by Henry D. Gilpin, Esq.]

that as no entry of the goods had been made, they were not liable to forfeiture even if that allegation were true. To this claim and answer a general replication was filed on behalf of the United States. On the 28th May, 1832, the attorney of the United States applied to the court for "an order on the claimants and their agents, to produce, at the trial of the above cause, the original invoice of the goods, wares, and merchandise, mentioned in the information; and, on the non-production thereof, that judgment be rendered in favour of the United States of America." At the same time an affidavit of James N. Barker, collector of the port of Philadelphia, was filed, to the following effect: "That the original invoice in question was, as the deponent believed, in the possession or power of Messrs. Cardwell and Potter, the agents of the claimants; that Mr. John Potter, one of that firm, declared to the deponent, in the month of December, 1831, that he had received it and exhibited it to his counsel, and that it was then in his possession or power; that Messrs. Cardwell and Potter had been requested to produce it at the custom house, which they refused to do; and that it contained evidence pertinent to the issue joined in the case." 1 Story's Laws, 59 [1 Stat. 82]; Geyger v. Geyger [Case No. 5,375].

Mr. Scott, for claimants.

This proceeding is novel in its character; such an order as that now asked for has never been made in a penal case; the object is to obtain from the claimants, evidence necessary to sustain the condemnation of their own property. The application is founded on the fifteenth section of the act of September 24, 1789; but that refers only to actions at law; it extends only to books and writings in which the parties are interested; it looks to a person as the defendant; it extends only to cases within the similar rule of chancery proceedings; and it must be preceded by adequate notice. The present case is defective in all these respects: (1) This is not an action at law, for that term is confined to proceedings according to the forms of the common law, where there is a party to act and to be acted on; it does not embrace suits of equity, admiralty, or maritime jurisdiction. (2) An invoice is not such a written instrument as is meant by "books and writings;" a bill of discovery only lies for papers to which both of the parties have a prima facie right, or which relate to a title of lands in dispute. (3) The act of congress expressly authorises a judgment against a person, the plaintiff or defendant, if the order is disobeyed; here there is no plaintiff or defendant, it is an information filed by a public officer against a thing; there can be no judgment, it must be a decree as to the property. (4) The ordinary rules of proceeding in chancery would not compel the production of such a paper; they never oblige a man to betray himself, or to disclose what will subject him to a penalty.

This proceeding is in fact penal, and to extract papers from the party accused, is to make him a witness against himself. (5) In requiring a preliminary motion and due notice, the act means something more than an ex parte affidavit: here too it is that of the collector, a party interested in the condemnation, and entitled to part of the proceeds; this is not sufficient. 3 Bl. Comm. 115; 1 Bac. Abr. 46; Co. Litt. 289; 2 Fonbl. Eq. 484, 491; Harrison v. Southcote, 1 Atk. 538; Bird v. Hardwicke, 1 Vern. 109; Harris v. Lewis, Whart. Dig. 631; Const. Amend. U. S. art. 5; Hylton v. Brown [Case No. 6,981]; Bas v. Steele [Id. 1,088]; Rose v. King, 5 Serg. & R. 245; Wright v. Crane, 13 Serg. & R. 450.

Mr. Gilpin, U. S. Dist. Atty.

This is a case clearly within the spirit of the act. Cardwell and Potter became possessed of this paper as agents; they were bound by law to produce it at the custom house in fifteen days after the vessel arrived; it was sent to them for that purpose; they refuse to do so, although they acknowledge they have it, and give no reason for the refusal. This is an action at law; it is not and could not be brought under the admiralty jurisdiction of the court, for the seizure was on land; in form it is similar to the proceedings in the English exchequer which is a common law court; it is commenced by information which is an old mode adopted in suits at law; there is an issue to the country on a matter of fact; and there must be a verdict of a jury; besides, this court is bound to administer the common law remedy where there is one, that is, to adopt the common law forms, the action at law, as it does in this instance. This invoice is certainly within the letter of the act, for it is "a writing containing evidence pertinent to the issue." Nor is there any difficulty in the court rendering a judgment against the parties, who are the United States and the claimant; judgment of non-suit can be entered against the former, and of default against the latter; and though the right of property is determined thereby, it is not more so than in actions of detinue or replevin; the first stage of proceeding is in rem, but when the claimant appears and issue is joined, the suit continues between the parties; the property may be delivered to the claimant on bond as in replevin. It cannot be said that the production of this paper will criminate the claimants, or that it is such a one as is prohibited by the rules of chancery, for the claimant must suffer on account of a fraudulent intention; the invoice does not show this, but merely the fact of valuation; it does not show whether it is too high or too low, whether it is made intentionally or accidentally wrong; the cases cited, are where the fact disclosed, of itself subjected the party to a penalty. Besides this paper is unlawfully in possession of the claimants, it belongs to the United States; and this precludes them from setting up any ground of privilege; it is exactly a case where chancery would interpose. The notice and proof given are sufficient to found the order upon; if possession is denied, then farther proof may be required; the affidavit of the collector is no more ex parte than the bill of a complainant in chancery, under his own oath. The cases cited for the claimants establish the sufficiency of the affidavit in this stage of the proceeding. 1 Story's Laws, 56 [1 Stat. 76]; The Sarah, 8 Wheat. [21 U. S.] 394; Reniger v. Fogossa, 1 Plow. 1; Weaver v. Earl of Meath, 2 Ves., Sr., 108; Finch v. Finch, Id. 492.

HOPKINSON, District Judge. The question to be decided in this case is one of entire novelty, and considerable importance. It arises on the construction of the fifteenth section of the act of congress of September 24, 1789, "to establish the judicial courts of the United States." Neither the counsel at the bar, nor the inquiries I have made since the argument, have been able to discover any judicial decision or practice, which affords us any aid in determining the question.

The case is this. An informaton has been filed against certain pins and needles, imported into the United States from England, and it is charged that they have become forfeited to the United States, by reason of a false valuation in an invoice, made up with an intent to defraud the revenue of the United States. A claim has been put in by Cardwell and Potter as agents for Kirby, Beard and Kirby, the exporting house in England, and the cause is in order for trial. The invoice, alleged to contain the false valuation, has never been produced at the custom house, and, of course, no entry of the goods has been or can be made, while it is withheld. The district attorney, nevertheless, proceeds for the forfeiture, under the fourth section of the act of May 28, 1830, by which it is enacted that "if any package or invoice be made up with intent, by a false valuation, to evade or defraud the revenue, the same shall be forfeited." On the trial of the issue under this information, the production of the invoice alleged to be false, will be required; and in order to obtain it, the district attorney has taken a "rule on the claimants to show cause, why an order should not be made on them and their agents to produce, at the trial of the cause, the original invoice of the goods mentioned in the information; and on the nonproduction thereof, that judgment be rendered in favour of the United States." This order is claimed of the court, under the fifteenth section of the act of September 24, 1789, above referred to. As a ground for this motion, the district attorney filed, in the first instance, the following affidavit: "James N. Barker, collector of the port of Philadelphia, being duly sworn according to law, deposes and says, that the original invoice of the twenty-eight cases of pins and one case of

needles mentioned in this information, is, as this deponent believes, in the possession and power of Messrs. Cardwell and Potter, the agents of the claimants; that Mr. John Potter, one of the said firm of Cardwell and Potter, declared to this deponent, in the month of December, 1831, that he had received the said invoice, and exhibited the same to his counsel, and that it was then in his possession and power; that the said Messrs. Cardwell and Potter have been requested to produce the same invoice at the custom house of this port, but have refused so to do; and that the same does, as this deponent verily believes, contain evidence pertinent to the issue formed in this case."

An objection was made to the sufficiency of this proof, inasmuch as the deponent is a party interested in the condemnation of the goods, being entitled to a certain portion of the forfeiture. I had no doubt, in looking at the authorities, that there was nothing in the objection; that the affidavit of the party is competent for this purpose; and that the affidavit may be taken ex parte without a cross-examination. Such has been the practice of the state courts, as well as of this court; and as the party on whom the call is made, may extricate himself from the difficulty by making oath that he has not the papers required of him, he cannot complain.

The ground being thus laid by the United States, by reasonable proof of the possession of the papers by the claimants, and of their contents, to show that they are pertinent to the issue, the question comes up, which has been argued at the bar, to wit: whether the case is comprehended within the terms and meaning of the fifteenth section of the act of September 24, 1789. As the decision of the question must turn on the language and intention of the whole section, every word must be carefully attended to. The section is as follows: "That all the said courts of the United States shall have power, in the trial of actions at law, on motion and due notice thereof being given, to require the parties to produce books or writings in their possession or power, which contain evidence pertinent to the issue, in cases and under circumstances where they might be compelled to produce the same, by the ordinary rules of proceeding in chancery; and if a plaintiff shall fail to comply with such order to produce books or writings, it shall be lawful for the courts, respectively, on motion, to give the like judgment for the defendant, as in cases of nonsuit; and if a defendant shall fail to comply with such order to produce books and writings, it shall be lawful for the courts, respectively, on motion, as aforesaid, to give judgment against him or her by default." Several of the phrases of the act have been commented upon, with great minuteness, to show that its provisions cannot be applied to a prosecution for a penalty or forfeiture; and a strict construction is demanded, because the enactments are highly penal. I do not find it

to be necessary to notice all the criticisms that have been made on the language of the law. There are some broad lines of description sufficiently definite, in my opinion, to direct us to the decision of the case. The courts of the United States have a power given to them, to require parties to produce books and writings in their possession or power, which contain evidence pertinent to the issue, "in cases and under circumstances where they might be compelled to produce the same by the ordinary rules of proceeding in chancery." Is this such a case? Would a court of chancery, on a bill of discovery, compel a party to produce evidence which would subject him to a forfeiture? I think not. No such order has been shown by a court of equity; and the authorities that have been referred to, hold a different doctrine.

In Fonblanque's Treatise on Equity (page 495), speaking of the objects of a court of equity, in enforcing discovery, it is said: "It may also happen that the situation of the defendant may render it improper for the court to enforce a discovery, as when the discovery might subject the defendant to pains and penalties, or to a forfeiture, or to something in the nature of a forfeiture." A reference is made to Mitford's Treatise on Equity, for a clear and comprehensive view of the same subject.

In the case of Harrison v. Southcote, 1 Atk. 528, the bill sought for a discovery of the defendant, whether S. was not a person professing the popish religion, before he conveyed the freehold and copyhold estates to the defendant, as a purchaser thereof. The lord chancellor (page 538) says: "It is not pretended that the defendant is a papist himself, therefore no penalty could fall upon him on that account: but yet he insists, if he should discover the person, under whom he bought, was a papist, it would defeat his title. To be sure, in general, by the determination in the case of Smith v. Read [Id. 526], it is settled, where there is a plea of a title derived, voluntarily or by a devise, from a papist, and not suggested to be a colourable trust, that by reason of the penal law, which would attach upon him, from the incapacity of the devisor to devise, the defendant shall not be compelled to discover, whether the person, under whom he claims, is a papist." The chancellor goes on to say: "The rule of law is that a man shall not be obliged to discover what may subject him to a penalty, not what must only." Although it should not appear with certainty whether the discovery would create a forfeiture, yet if it eventually may do so, it is sufficient to protect the party from a discovery. Thus it would seem that the penal consequences, which may fall upon the claimants, by the production of the invoice called for by the United States, make it a case not within the provisions of the act of congress.

There is another part of the act, which

describes the kind of suit or action, to which the law was intended to be applied, and brings us to the question whether a proceeding in rem is within its provisions. I mean a proceeding merely and exclusively in rem throughout, and not when parties come in after its commencement, after which the suit is no longer altogether in rem. The act directs, that "if a defendant shall fail to comply with such order to produce books and writings, it shall be lawful for the courts respectively, on motion as aforesaid, to give judgment against him or her by default." This part of the law clearly looks to a person as defendant, against whom a judgment by default may be given, and may be enforced by execution. Can any such judgment, in form or effect, be rendered in a case like that before us? The United States assert that the goods mentioned in the information have been forfeited for the causes therein set forth, and have thereby become the property of the United States. Certain persons come in and deny the forfeiture, and claim the goods as their property. But they are not substituted as defendants in the cause. It stands, in this respect, as it did before the claim was put in. The goods are brought under the authority and control of the court, and two parties appear to claim them, and the judgment of the court is to decide to which of the claimants they rightfully belong. The action or proceeding of both is upon and against the goods in the custody of the court, and there is, legally speaking, no party defendant in the case. If the issue be decided in favour of the United States by the verdict of a jury, or by a judgment for default of any appearance or adverse claim, what is that judgment? Simply that the goods are forfeited for the causes set out, and are accordingly condemned; and the consequence is that they are ordered to be sold, and the proceeds to be distributed according to law. All these proceedings are exclusively against the property, the thing, and not against any person or party defendant whatever. If I were to grant the order moved for, and the claimants on the trial should refuse to obey it, how could I follow the directions of the act; how inflict the penalty appointed for the default? Where is the defendant against whom I could render the judgment required? Could I forfeit and condemn the goods? The act gives me no such authority. Such a judgment might act upon the rights and property of innocent persons, not before the court; for the claimants may, in truth, have no property in the goods, they may belong to other persons. If then the claimants may be considered as a party defendant in this cause, they are protected from the order prayed for by the chancery principles referred to: and if they cannot be considered as defendants, they are not within the provision of the act of congress.

The motion of the district attorney is de-

nied; but he may give his notice to produce the papers he wants, and if they are not produced or accounted for, he will have the advantage of the refusal or neglect before the jury, independent of the provisions and remedies of the act of congress.

On the 10th January, 1833, the case came on for trial. The evidence, on the part of the United States, consisted of the original report and manifest of the cargo of the Monongahela, delivered to the collector at Philadelphia on the 9th November, 1830, wherein the packages mentioned in the information were described as consigned to Cardwell and Potter; of a permit on the 27th November to land those packages (not being claimed) and take them to the custom house; and of a bill of the inspector on the same day, showing they had been accordingly landed and taken there. Witnesses were also called to prove that the packages had remained in store ever since, in the place appropriated to unclaimed goods; that no invoice thereof had been produced, or entry of them made at the custom house; that a formal notice had been served on the attorney of the claimants on the 31st December, 1832, to produce at this trial the original invoice, which was not done. It was then testified, on behalf of the United States, by Edward Ewing, an assistant appraiser, that John Potter, one of the firm of Cardwell and Potter, by whom the claim was made in this case, on behalf of Kirby, Beard and Kirby, had expressly declared, that he had the invoice in question, but would not produce it; that the value of the pins, as stated in the invoice, was similar to that stated in the invoice of the pins imported in the Alleghany, which were forfeited for a false valuation; and that these packages were of the same quality as those. It was also proved, that a subpœna duces tecum had been duly served on John Potter, requiring him to attend at this trial and bring the invoice with him; but he made default and never appeared. It was admitted, on the part of the United States, that they had no evidence of any other invoice of the goods in question, nor of the production of any invoice at the custom house, nor of any entry of the goods having been made or offered to be made. The claimants offered no evidence whatever on their part.

Mr. Gilpin, U. S. Dist. Atty.

The consignors of these goods committed the violation of the law in sending a false invoice with them, and they must take the consequence of that act. When goods, subject to ad valorem duty, are imported, if they are accompanied with an invoice fraudulently made up, the forfeiture accrues. On this principle the revenue laws have been founded, from the beginning of the government; they consider the invoice as a necessary title deed, as it were, of all goods, and have uniformly guarded its correctness, and punished its falsi-

fication. Independently of any entry, the invoice is made the subject of numerous provisions, in almost every revenue law from 1789 to the present time. Whenever goods are imported into the United States, they are to have a true invoice, and, if it is wanting, satisfactory reasons must be given by the importer before he makes his entry. The act of March 1, 1823 (3 Story's Laws, 1887 [3 Stat. 734]), is the most elaborate and complete law relative to ad valorem goods; it is the result of much experiment; the thirteenth section, which provides the penalties for fraudulent invoices, looks simply to the importation, not to the entry; if the goods are imported, and the invoice that accompanies them be false, then fifty per cent. is added to their appraised value, to be paid as a penalty. The act of May 28, 1830, is supplementary to this; it changes the penalty to forfeiture; it refers to goods imported, and subjects any package of such goods, made up with intent to evade the revenue, to forfeiture: it is the fraudulent making up of the package and the importation, not the entry, which constitute the offence. Pamph. Laws 1830, p. 105. The Robert Edwards, 6 Wheat. [19 U. S.] 188; The Boston [Case. No. 1,670]; U. S. v. Lindsey [Id. 15,603]; Perots v. U. S. [Id. 10,993]; U. S. v. Lyman [Id. 15,647]. Here then the making up and existence of the invoice; its similarity to one ascertained to be fraudulent; the similarity of the goods mentioned in it to those already forfeited. are all proved; the possession by the agents of the claimants and their refusal to produce the invoice are also proved, and afford a legal presumption that its contents are as asserted; finally, the importation of the goods is fully proved. These facts bring the case within the law, whether or not an entry was made or offered to be made.

Mr. Scott and J. R. Ingersoll, for claimants.

The act of May 28, 1830, is intended to punish a fraud on the United States; a mere undervaluation does not defraud them; the goods are in their possession and they can value them as they like; but it is presenting and using a false invoice to mislead and deceive them, that is fraudulent. Here, judicially, we cannot know even that an invoice exists; none has been presented or used. This act of congress evidently presumes that the invoice exists, has been presented, and used with a fraudulent design, when it declares the forfeiture shall accrue. In this respect it is founded on all the previous revenue acts. They all require the invoice to be produced; that requisition is in full force; in no respect repealed. It is always to be produced at the time of entry or the want of it satisfactorily accounted for. Without this there can be no entry and the goods are to be deposited in the public stores If suffered to remain there nine months without invoice or entry, they are to be sold, the duties paid, and the balance put into the treasury of the United States. The present case is exactly such as is contemplated by this provision; ample time has been given to produce the invoice and make the entry; they are not done; the goods should therefore be sold. The officers of the customs cannot substitute a new mode; they cannot sell or forfeit as they choose; the law provides for the different cases, and they must comply with it in each case; if the goods are left in their care, without invoice or entry, they must sell them; if they are accompanied with a fraudulent invoice and entry, they must seize them. Mere intention to violate the law, unless followed by an attempt to do so, cannot be punished; this attempt is not the making, but the presentation of the invoice; the use of it for the fraudulent purpose. In all cases of forfeiture for false invoices. the entry has been made or attempted, and the invoice produced. 1 Story's Laws, 623, 631 [1 Stat. 670, 676]; 3 Story's Laws, 1679, 1680, 1684, 1881, 1887 [3 Stat. 433, 434, 433, 729, 735]; U. S. v. Riddle, 5 Cranch [9 U. S.] 311; U. S. v. 150 Crates of Earthenware, 3 Wheat. [16 U. S.] 232; U. S. v. Six Packages of Goods, 6 Wheat. [19 U. S.] 520; U. S. v. Sixty Pipes of Brandy, 10 Wheat. [23 U. S.] 425; U. S. v. Tappan, 11 Wheat. [24 U. S.] 419; Harris v. Dennie, 3 Pet. [28 U. S.] 304; U. S. v. Sixteen Packages [Case No. 16,303]; Tappan v. U. S. [Id. 13,749]; U. S. v. May [Id. 15,752]; Howland v. Harris [Id. 6,794]; Ninety-Five Bales of Paper v. U. S. [Id. 10,274]; Goodwin v. U. S.. [Id. 5,554]; The Tiger, 1 Jour. Jur. 105.

HOPKINSON, District Judge (charging jury). The goods described in the information were sent by the claimants Messrs. Kirby, Beard and Kirby, of London, to the United States, by the ship Monongahela, consigned to their agents, Cardwell and Potter of this city. The ship arrived at this port in November, 1830, having these goods on board. No invoice of them having been produced at the custom house, nor entry made, or offered to be made, within the time prescribed by law, the goods were taken possession of by the officers of the customs, and deposited in the public store house, where they now remain.

It has been testified by Mr. Edward Ewing, that Mr. Potter, one of the consignees, acknowledged to him in the spring of 1831, that he had an invoice of the pins imported by the Monongahela, but that he would not produce it until the other case was decided. The other case he alluded to was a previous importation of pins, sent by the claimants to the same consignees, by the ship Alleghany, which had been entered at the custom house, and were then under seizure for an alleged fraudulent undervaluation in the invoice..

The district attorney having given due notice to the counsel of the claimants to produce, on this trial, the invoice mentioned by the witness, was proceeding to prove its contents, when an objection was made on behalf of the claimants. It was, however, eventually agreed, by their counsel, that the invoice and its contents should be considered as before

the court for the purposes of argument, and that the question should be as to its admissibility as evidence. The district attorney admitted that he has no evidence of any other invoice of the goods mentioned in the information than that testified by his witness Edward Ewing; and that he has no evidence of the production of any invoice of the said goods at the custom house, for the purposes of entry, nor of any entry actually made of them. The object of both parties is to obtain the opinion of the court on a question of law, which if determined in favor of the claimants must decide the cause against the United States, and will save to the court and jury the time and labour of examining a great mass of evidence.

The question arises on the construction of the fourth section of the act of May 28, 1830, "for the more effectual collection of the impost duties." By this section it is enacted, "that the collectors of the customs shall cause at least one package out of every invoice, and one package at least out of every twenty packages of each invoice, and a greater number should he deem it necessary, of goods imported into the respective districts, which package or packages he shall have first designated on the invoice, to be opened and examined, and if the same be found not to correspond with the invoice, or to be falsely charged in such invoice, the collector shall order, forthwith, all the goods contained in the said entry to be inspected; and if such goods be subject to ad valorem duty, the same shall be appraised, and if any package shall be found to contain any article not described in the invoice, or if such package or invoice be made up with intent, by a false valuation, or extension, or otherwise, to evade or defraud the revenue, the same shall be forfeited."

On the part of the claimants it is contended, that the invoice mentioned in this law, is an invoice which has been produced at the custom house, for the entry of the goods: and that when no invoice has been there produced, nor any entry of the goods made or attempted to be made, no forfeiture accrues, but the goods are to be proceeded with, according to the directions of the revenue laws, in all cases where no invoice is produced or entry made. On the other hand it is argued, on behalf of the United States, that the cases of the nonproduction of an invoice, provided for by the revenue laws, are those in which no invoice exists; or has not been sent with the goods by accident or mistake; but that in this case the invoice is proved to be in existence and in the possession of the agents of the claimants; and that if the United States can prove that this invoice was made up with intent to evade and defraud the revenue of the United States, the goods are liable to forfeiture, whether the invoice has or has not been produced at the custom house for an entry. The question, in short, is whether the forfeiture inflicted by the act applies generally to any and every invoice, made up to defraud the revenue; or whether the language and true meaning of the

section embrace only, the cases in which the false invoice was actually produced at the custom house, and an entry made or attempted to be made by it. This is a case in which a court must be guarded to keep within the judicial pale; and not take a step into the legislative domain, under impulses given by the circumstances of the case. We must look closely and exclusively to what legislation has done on the subject, and be careful to do no more. The formation of a system of revenue laws is. necessarily, a work of progression, experiment and improvement. It has to provide for a continual struggle between the law makers and the law breakers; between the officers of the government, whose duty it is to enforce the revenue laws, and the importers of foreign goods whose interest urges them to invent expedients to evade them. In such a state of things, deficiencies will be discovered by experience, which sagacity could not foresee; and new legislation will, from time to time, be required. to meet new devices of evasion. We accordingly see that, from the first organization of our government, congress have been repeatedly called upon to modify and amend their revenue laws; to add to the security of the revenue by new guards; to increase the penalties; to provide for omitted cases; and to cure doubts and ambiguities; so as to enable the courts to reach and punish the violators of the law. But the courts have never assumed the office of supplying legislative defects; and a judge should especially look to the limitations of his powers, when he approaches a case of evil aspect and bad fame.

The first rule in the construction of a statute is to look to the statute itself for its meaning and intention: and, if they be found clearly and unequivocally expressed, to go no farther. If they be not so. we may turn to other acts on the same subject, and by a full and fair view of the whole, fix and adopt a construction for a doubtful part. Our first duty, then, is to examine the law of May 2S, 1830. The information now trying is founded on it; it is laid in the words of the law, and must abide by the provisions of the law. The first three sections do not bear upon the question we are attending to. They relate to the appointment of appraisers, and the manner of making appraisements, without any reference to the invoices. Our case must be decided by the enactments of the fourth section. They are as follows: "That the collectors of the customs shall cause, at least, one package out of every invoice, and one package, at least, out of every twenty packages of each invoice of goods imported. which package or packages. he shall have first designated on the invoice, to be opened and examined, and if the same be found not to correspond with the invoice, or to be falsely charged in such invoice, the collector shall order, forthwith, all the goods contained in the same entry to be inspected: and, if such goods be sub-

ject to ad valorem duty, the same shall be appraised: and if any package shall be found to contain any article not described in the invoice, or if such package or invoice be made up with intent, by a false valuation, or extension or otherwise to evade or defraud the revenue, the same shall be forfeited." There is, then, a provision, that "no goods liable to be inspected or appraised as aforesaid, shall be delivered from the custody of the officers of the customs, until the same shall have been inspected or appraised, or until the packages sent to be inspected or appraised shall be found correctly and fairly invoiced and put up, and so reported to the collector." It seems to me to be impossible to read this fourth section with any other impression or belief than that the invoice, referred to throughout, is an invoice which has been produced to, and been in the possession of the collector. There is not a phrase in the law that can have any other meaning by any form of legitimate construction. Every direction given to the collector supposes and requires him to have the invoice before him; he cannot take a step in performance of the duties imposed upon him; he cannot comply with one of the requisitions of the act, without it. He is to cause one package, at least, out of every twenty to be opened and examined, but, before he does this, he is to designate the packages, which are to be opened and examined, on the invoice. Can this be done with an invoice which he has not, which he has never seen, which remains in the desk of the consignees, and of the existence of which he knows nothing but by report? The act proceeds: if the package, thus designated and examined, "shall be found not to correspond with the invoice." We ask, again, if he has not the invoice, how can he decide whether the package does or does not correspond with it? "Or if the package designated shall be found to be falsely charged in such invoice," the collector then, and only then, shall order all the goods, contained in the entry, to be inspected. This provision supposes not only an invoice in the hands of the collector, but an entry, at least initiate, made by and with it. After all these proceedings have been had, as preparatory to the result, the act inflicts its penalty of forfeiture of goods, subject to an ad valorem duty. But in what event is this forfeiture inflicted? When on an examination and appraisement, any "package shall be found to contain any article, not described in the invoice, or if such package or invoice be made up with intent to defraud the revenue.". And where is this false valuation to be made? Certainly in the invoice. And how is the collector to know whether it be true or false if he has never seen it? Is he to be allowed to seize imported goods, not to answer for the duties, but as forfeited, for specified causes mentioned in the act, and to take his chance of finding somewhere and somehow an invoice for them, in which they are falsely charged? Or is he not, before he makes any such seizure, to have the legal, prescribed, statutory evidence of the offence, in his power, in the manner directed by the statute? When a forfeiture for a fraudulent undervaluation of goods was ordained by this act, the proceedings by which it is to be reached, the restrictions and precautions under which it is to be enforced, were distinctly set out, and must be strictly attended to. Antecedent statutes, imposing inferior penalties for the same offence, seem to apply only to cases of false invoices produced at the custom house, for the purposes of an entry. If we do not confine ourselves to the invoice so produced, where are we to look for it? Has the collector any authority to demand of the importer an invoice for his goods, who comes not to the custom house with it? Can he officially know that he has one, when no entry has been asked for the goods? The reply would be: "You have the goods in your possession: they are sufficient to answer any demand you have against them; your security is in your hands, at your disposal, and the means of getting from it the duties of the revenue, are pointed out by the law; follow that guide, and the United States will lose nothing they are entitled to on the importation."

If the true meaning of the law be that which I have given to it, we are bound so to understand and execute it; and if inconvenient or injurious consequences result from it, the remedy must be found in another place. But let us, for a moment, inquire whether it is not right, and according to the sound principles of criminal law, that the act in question should be what I have supposed it to be. We will suppose, as was probably the case, that the invoice before us, was made up with intent to defraud the revenue, by a false valuation of the articles contained in it. Is this an offence punishable by our law? What is it but an intention to defraud; a design contemplated; a scheme formed, but not executed, for that purpose? It cannot be said that the attempt was made, but preparation for the attempt. The machinery was ready but its actual use was arrested by the consignee, to whom the operation was entrusted, but who, for such reasons as he thought good, declined to make the intended use of it. The invoice made up with intent to defraud the revenue was withheld, and no attempt to perpetrate the fraud with it was ever made. It never was used or produced, or, as far as we know, held by the consignee for any purpose connected with the revenue, or in any transaction in relation to these goods with the officers of the customs.

The case of U. S. v. Riddle, 5 Cranch [9 U. S.] 311, appears to me to have been a better one for the United States than this. The

goods in that case had been seized, because they were not invoiced according to the actual cost thereof at the place of exportation, with design to evade part of the duties. The consignee received, with the goods, two invoices: one charging them at about one half the cost of the other, with directions to enter them by the small invoice, and sell them by the larger. Both invoices were delivered by the consignee to the collector: and, of course, one step more was taken in that case than in this. The false invoice was, at least, officially known to the collector, and lawfully in his possession. The entry was made on the larger invoice by the advice of the collector. He, nevertheless, seized the goods as forfeited under the sixty-sixth section of the act of March 2, 1799 (1 Story's Laws, 631 [1 Stat. 676]). The words of that section are: "That if any goods of which entry shall have been made, shall not be invoiced according to the actual cost thereof at the place of exportation, with design to evade the duties thereupon, all such goods shall be forfeited." The goods were so far within the words of the law that they had been entered, and were not invoiced according to their actual cost, and the invoice was delivered to the collector. But Chief Justice Marshall, delivering the opinion of the court, said "the case was too plain to admit of an argument, or to require deliberation. He thought it not within even the letter of the law, and certainly not within the spirit. The law did not intend to punish the intention, but the attempt to defraud the revenue." The court, therefore, in that case, could not have thought, as has been contended here, that the making up of a false invoice, at the place of exportation with intent to defraud, was an offence against this law, until followed up by an actual attempt to perpetrate the fraud, by the use of it at the custom house to obtain an entry. The principles of this case are substantially recognised by Judge Washington, in the case of Goodwin v. U. S. [Case No. 5,554], which arose, also, on the thirty-sixth and sixty-sixth sections of the act of March 2, 1799. Judge Washington says: The offence consists in "the making an entry upon an invoice below the actual cost of the goods, with design to evade the duties:" and he also says: "If for want of an invoice, or for any other cause, an imperfect entry is made, so that the particulars of the goods are unknown, the goods are to pass to, and remain in the possession of the collector until the particular cost or value, as the case may be, shall be ascertained, either by the exhibition of the original invoice or by appraisement, at the option of the importer." If he does not choose to exhibit his invoice the alternative is that the goods must be valued by an appraisement.

While we are bound to take the law as we find it, and the legislature must provide a remedy for any evils that may have been overlooked, we may ask, will the construction I have put upon the act of 1830, expose the revenue to losses by fraud? I think not; the revenue laws afford an ample protection against any injury from this construction of that act. We are to remember that the sole object of these laws is the full payment and collection of the duties, on foreign goods: they are not intended to be a criminal or moral code, for the punishment of crimes and immoralities. In the case of U. S. v. Sixty Pipes of Brandy, 10 Wheat. [23 U. S.] 425, the supreme court declares "that the government had nothing in view but the security of its own revenue, without interfering with those devices of the mercantile world, which look only to individual profit, without defrauding the government." Can the revenue be injuriously affected by such a transaction as we have before us? Can it, in any way, be defrauded or diminished? It may be increased, inasmuch as the appraised value, made by the officers of the customs, with a view to the duties to be estimated on it, may put that value too high; it is hardly probable that they will fall into the fault or error of an undervaluation. What is the course of proceeding in the custom house when no invoice is produced, or entry made of goods imported?. It is one that precludes any possibility of fraud upon the revenue, and probability of loss to it. On the contrary, not only is the payment of all the duties fully secured, but also of all costs and charges which may attend the collection.

The first section of the act of April 20, 1818 (3 Story's Laws, 1679 [3 Stat. 433]), enacted that no goods should be admitted to an entry, unless the original invoice was produced; but such goods, that is, the goods of which the invoice was not produced, were to be deposited in the public warehouse at the expense and risk of the owner; and if the invoice was not produced within the times limited by the act, the goods were to be appraised, and the duties estimated in the manner directed by the act. The act of March 1, 1823 (3 Story's Laws, 1881 [3 Stat. 729]), enacts that no goods subject to an ad valorem duty, shall be admitted to an entry, unless the true invoice of the same be presented to the collector at the time of entry, or unless the same are admitted in the mode authorised and prescribed in the next section of the act. The next section enacts that when no invoice has been received of goods subject to ad valorem duty, and the consignee shall make oath of the same, the collector may, if in his judgment the circumstances of the case render it expedient, admit them to entry, on an appraisement thereof. Bonds are to be given with sufficient sureties, to produce the invoice within given periods and to pay the amount of the duties. The third section provides that when goods, imported into the United States, shall not have been entered in pursuance of this or any other act regulating imposts and tonnage, the same shall be deposited, according to existing laws, in the public warehouse, until such invoice be produced. If, after they have re-

mained there, during the period limited by the act, no invoice is produced, the goods are to be appraised and the duties estimated in the manner directed by the act. Power is given to the collector to make sales, before the expiration of the limited period, to discharge such duties and intervening charges as shall become due; and also to direct earlier sales of perishable articles. Thus the United States hold, in their own hands, a sufficient security, not only for the duties, but are saved from any loss by the power given to sell to pay intervening charges; as well as all articles which might perish in their possession.

The second section of this act of March 1, 1823, contains a provision not found in the law of April 20, 1818. By the latter the secretary of the treasury is authorised, if he thinks it expedient, to direct the collector to admit goods to an entry, without an invoice, on an appraisement, taking bonds to produce the invoice and pay the duties. The act of March 1, 1823, refers this subject to the judgment of the collector, but not in any case of non-production of the invoice as in the former law, but only "when no invoice has been received;" and the consignee makes oath of that fact. We thus see that the requisition of an invoice for an entry is positive and indispensable, as a general provision; but it may be dispensed with in a given case and under certain restrictions; that is, when no invoice has been received by the consignee, and he makes oath of that fact. He is then permitted to make the entry, without the invoice, as an indulgence to a presumed accident or mistake. This indulgence can be allowed only when the non-production of the invoice is owing to the fact that it has not been received, under the promise and expectation that it will afterwards be received and produced according to law. What, then, is to be the course of proceeding with goods of which the invoice has not been produced, nor accounted for in the manner mentioned, nor any promise or bond given for its production at a future day? Clearly, they are not to be admitted to an entry; they are not to be delivered to the consignee or importer, as in the other case, but they are to be deposited in the warehouse, to be disposed of in the manner already described. This is the only difference of treatment I can discover between the non-production of an invoice because it has not been received, and its non-production because it does not exist, is not expected to be received, or is withheld for any cause or reason the importer or consignee may choose to act upon. If he will not produce the invoice, he will not be permitted to enter the goods, and they will remain subject to all the consequences and proceedings provided by the law in such cases.

It is my opinion, therefore, that if the invoice mentioned had been produced, it would not make out the case of the United States, however false it may be, and with whatever intent it was made up, as it is admitted by the district attorney that he is unable to offer any proof that it, or any other invoice of the goods in question, was produced at the custom house for the purpose of making an entry.

The jury found a verdict for the claimants.