UNITED STATES of America,
Plaintiff, Appellee,

v.

VEN–FUEL, INC., Defendant,
Appellant.

No. 84–1268.

United States Court of Appeals,
First Circuit.

Argued Sept. 7, 1984.

Decided March 21, 1985.

James E. Tribble, Miami, Fla., with whom Joseph A. Moretz, Blackwell, Walker, Gray, Powers, Flick & Hoehl, Miami, Fla., Gerald F. Rath, and Herrick & Smith, Boston, Mass., were on brief, for defendant, appellant.

Paul W. Johnson, Asst. U.S. Atty., Boston, Mass., with whom Richard E. Welch, Asst. U.S. Atty., and William F. Weld, U.S. Atty., Boston, Mass., were on brief, for plaintiff, appellee.

Before BOWNES and BREYER, Circuit Judges, and SELYA,* District Judge.

SELYA, District Judge.

The government sued Ven-Fuel, Inc. (Ven-Fuel) in the District Court for the District of Massachusetts under 19 U.S.C. § 1592 (1970) for the imposition of a civil penalty referable to Ven-Fuel's illicit importation of residual fuel oil into the United States, and more specifically, into Massachusetts, in 1974. The district court entered judgment against Ven-Fuel and assessed a civil penalty in the sum of $783,500. Ven-Fuel appeals.

## I. OIL IMPORT LICENSE PROGRAM.

The federal oil import license program as it existed a decade ago lies at the core of this controversy. In order to put the rather daedalian nature of the underlying events and proceedings into proper perspective, it is advisable first to focus on the scope and extent of the applicable regulatory scheme.

In the event that any "article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security," Congress has authorized the President to "take such action ... as he deems necessary to adjust the imports of such article and its derivatives so that such imports will not threaten to impair the national security...." 19 U.S.C. § 1862(b) (1982). The predecessor statutes contained similar authorizations. President Eisenhower exercised this authority to impose a system of quotas on the importation of petroleum and petroleum products in 1959. Presidential Proclamation No. 3279, 3 C.F.R. 11 (1959–63 Comp.). More than a decade later, on April 18, 1973, President Nixon issued Presidential Proclamation No. 4210, 3 C.F.R. 31, 32 (1974), 38 Fed.Reg. 9645 (1973), which provided "for a gradual transition from the existing quota method of adjusting imports of petroleum and petroleum products to a long-term program for adjustment of imports of petroleum and petroleum products through the suspension of existing tariffs and the institution of a system of fees applicable to imports of crude oil, unfinished oils, and finished products...." *See generally Federal Energy Administration v. Algonquin SNG, Inc.,* 426 U.S. 548, 552–53, 96 S.Ct. 2295, 2298–99, 49 L.Ed.2d 49 (1976). Section 1(a) of that proclamation prohibited the entry of crude oil, unfinished oils, or finished products into the United States except "by or for the account of a person to whom a license has been issued by the Secretary of the Interior pursuant to an allocation made to such person by the Secretary." 38 Fed. Reg. at 9646. Section 2(a) established the maximum levels of imports which could be made without the prior payment of fees. *Id.* at 9647–48. Section 3(a) established "a system of fees for licenses issued under allocations of imports of crude oil, unfinished oils, and finished products over the [maximum] levels of imports." *Id.* at 9648–49. For residual fuel oil, section 3(a) imposed a fee of thirty cents per barrel as of May 1, 1974, and forty-two cents per barrel as of November 1, 1974. *Id.* Section 3(b) provided that:

> Except for allocations and licenses to which the license fee is not applicable, applications for allocations of imports of crude oil, unfinished oils, or finished products shall be accompanied by the applicant's certified check ... in the appropriate amount....

*Id.* at 9649.

Section 4(a) authorized the Secretary to issue regulations for the purpose of implementing the proclamation. *Id.* On February 11, 1974, the Secretary issued proposed regulations, 39 Fed.Reg. 5193 (1974), amending Oil Import Regulation 1 (Revision 5) (1974), to conform to Presidential Proclamation 4210. On March 19, 1974, the Secretary issued final regulations governing the allocation period from May 1, 1974 through April 30, 1975. *See* 39 Fed. Reg. 10242 (1974) (codified at 32A C.F.R. Ch. X (1974)).

---

* Of the District of Rhode Island, sitting by designation.

Section 12 of the final regulations controlled allocations of imports of residual fuel oil, not subject to license fees, into District I, so-called. (District I encompassed the eastern seaboard from Maine to Florida.) 32A C.F.R. Ch. X, § 12, 39 Fed. Reg. at 10246. Section 12(b) provided in material part that:

> To be eligible for an import allocation not subject to license fee of residual fuel oil pursuant to this section a person must: (1) Be in the business in District I of selling residual fuel oil ... and have under his management and operational control a deepwater terminal located in District I into which there has been delivered residual fuel oil ... which he owned at the time of delivery, or
> (2) Be in the business in District I of selling residual fuel oil ... and have a throughout agreement with a deepwater terminal operator under which agreement the person has delivered to the terminal residual fuel oil ... which he owned when it was so delivered.

32A C.F.R. Ch. X, § 12(b), 39 Fed.Reg. at 10246.

Section 12(c) further required that:

> A person seeking an import allocation not subject to license fee ... must file an application with the Director [of the Office of Oil and Gas] on such form as he may prescribe. The application shall disclose such information as the Director may deem necessary in such detail as he may require.

32A C.F.R. Ch. X, § 12(c), 39 Fed.Reg. at 10246. The final regulations required that applications be filed by March 31, 1974, in accordance with § 5(a). *Id.* Section 12(d) limned the allocation to import residual fuel oil into District I which each eligible applicant would receive. 32A C.F.R. Ch. X, § 12(d), 39 Fed.Reg. at 10246. And, § 12(e) declared that:

> No allocation made pursuant to this section may be sold, assigned or otherwise transferred.

32A C.F.R. Ch. X, § 12(e), 39 Fed.Reg. at 10246.

One ineligible for an allocation exempt from license fees could apply for an allocation subject to such fees. 32A C.F.R. Ch. X, § 32 (1974). Section 32(i)(1) imposed the fee schedule mandated by Presidential Proclamation 4210. 32A C.F.R. Ch. X, § 32(i)(1) (1974). Once the applicant had obtained an allocation, a license would issue specifying the amount of oil which could be imported. 32A C.F.R. Ch. X, § 7(a), 39 Fed.Reg. at 10243. Section 7(b) declared that:

> No license issued pursuant to this section may be sold, assigned, or otherwise transferred.

32A C.F.R. Ch. X, § 7(b), 39 Fed.Reg. at 10243. Section 18 required that a valid oil import license must be presented to the federal Customs Service before any petroleum product subject to the regulations could be entered for consumption. 32A C.F.R. Ch. X, § 18.

## II. FACTS.

Inasmuch as the "clearly erroneous" standard, Fed.R.Civ.P. 52(a), applies to our assessment of the determinations below,[1] we present the facts and the reasonable inferences therefrom in the manner most

---

**1.** Though the district court initially granted a partial summary judgment on liability in favor of the government, *United States v. Ven-Fuel, Inc.*, C.A. No. 80-335-Z, slip op. at 8 (D.Mass. Oct. 6, 1982), a bench trial ensued on damages. For reasons which will more clearly appear, *see* text *post*, the trial necessarily involved presentation of all of the proof as to Ven-Fuel's culpability. And, in an *ore tenus* decision (March 15, 1984) following the bench trial, the district court reaffirmed its liability finding upon consideration of all of the evidence, R.A. at 507–10, 532–38, 547–48, Ven-Fuel having moved to va-

cate the earlier summary judgment. R.A. at 509–10. The parties have alluded to no significant disagreements about the underlying facts, nor has either pointed to any further factual evidence which it wished to present. Under these circumstances, we *should set aside* the district court's factual inferences only if they are clearly erroneous. *Federacion de Empleados del Tribunal de Justicia v. Torres*, 747 F.2d 35, 36 (1st Cir.1984); *Vetter v. Frosch*, 599 F.2d 630, 632 (5th Cir.1979); *Starsky v. Williams*, 512 F.2d 109, 111 (9th Cir.1975).

hospitable to the appellee, to the extent consistent with record support.

Ven-Fuel is a joint enterprise owned in fifty percent increments by a subsidiary of a publicly-held corporation with business interests spanning the globe and by the corporate alter ego of the Venezuelan government. Julio Iglesias was its chief executive officer. The district court found, and the record bears out, that Iglesias was an experienced and sophisticated businessman. Jack Cusler, a lawyer/engineer, served as Ven-Fuel's vice president until mid-1973. Thereafter, Gusler (who was at that point transferred to the payroll of the appellant's publicly-traded corporate grandparent) continued to have responsibility for providing legal advice to Ven-Fuel. Jose Arellano, also well versed in the elaborate intricacies of international oil dealings, joined Ven-Fuel in early 1973 as Gusler's subordinate, and succeeded to Gusler's day-to-day operational responsibilities upon the latter's departure.[2]

Ven-Fuel had received an import license from the federal Department of the Interior (Interior) for the period April 1, 1973 through March 31, 1974. It desired to obtain a further fee-free license for the period May 1, 1974 through April 30, 1975. To be eligible for a fee-free license to import residual fuel oil during this time span, an applicant had to have a deepwater terminal under its control, or in lieu thereof, a throughput agreement with a deepwater terminal operator. Oil Import Regulation 1, § 12 (Revision 5), 37 Fed.Reg. 4259, 4261 (March 1, 1972). Ven-Fuel had neither. Arellano, with full awareness of the underlying facts, nevertheless submitted the completed application in March of 1974. He certified, erroneously, that Ven-Fuel was eligible for the license. The application was rife with misstatements.[3] The license issued. Thereafter, during the currency of the improperly-obtained license, Ven-Fuel brought 927,142 barrels of residual fuel oil into the United States, much of it at Massachusetts ports. The parties stipulated that the "entered value" of the cargo, that is, the purchase price paid by the importer, converted to dollars, was $9,366,506 and that its domestic value, that is, the price for which the importer eventually sold the oil in the United States, was in excess of $11,950,892. If Ven-Fuel had imported the same goods pursuant to a fee-paid (rather than a fee-free) license, it would have incurred permit costs of $296,956.80.

## III. PROCEEDINGS BELOW.

The government did not discover the appellant's artifice until well after the fact. The Customs Service issued a notice of penalty to Ven-Fuel in December of 1978. Thereafter, in February of 1980, suit was brought. The United States alleged in substance that the appellant had imported the oil by means of false statements and false or fraudulent practices or appliances in violation of 19 U.S.C. § 1592 (1970).[4] Subse-

---

2. Arellano was named as a codefendant in this action, but the district court found that the statute of limitations, 19 U.S.C. § 1621, barred suit against him. Although the government appealed from the judgment in Arellano's favor, that appeal is not presently before us. Ven-Fuel, having executed a waiver of the applicable limitations period in August of 1979, has not asserted a similar defense.

3. No useful purpose would be served by detailing the manner and extent of Arellano's carelessness. Ven-Fuel concedes that it was not in fact eligible for the license, and the district's court's finding that the appellant was negligent in both the preparation and the submission of the application is so well documented that no serious challenge to that finding will lie.

4. Section 1592 was amended on October 3, 1978, as a part of the Customs Procedural Reform and Simplification Act of 1978 (CPRSA). Except for 19 U.S.C. § 1592(e), which took effect contemporaneous with passage, the amendments are applicable only to proceedings commenced more than eighty-nine days after enactment. Pub.L. 95–410, Title I, § 110(f), 92 Stat. 893 (1978) (note following 19 U.S.C.A. § 1592). For purposes of determining to which cases the amendments are applicable, an action is commenced when a penalty or prepenalty notice is issued. S.Rep. No. 778, 95th Cong., 2nd Sess. 20, *reprinted in* 1978 U.S.Code Cong. & Ad. News, 2211, 2231; H.Conf.Rep. No. 1517, 95th Cong., 2nd Sess. 13, *reprinted in* 1978 U.S.Code Cong. & Ad.News 2249, 2255. The promulgation of the penalty notice by the Customs Service on December 13, 1978 (some seventy-one

quently, the government moved for partial summary judgment under Fed.R.Civ.P. 56. On October 6, 1982, *see* note 1 *ante*, the district court granted the motion as to liability, holding that, on the uncontroverted facts, Ven-Fuel had made false statements in order to obtain the fee-free license. In view of § 1592(e), as amended, *see* note 4 *ante*, which conditions the amount of the penalty to be assessed on the degree of the importer's culpability,[5] the matter of damages was reserved for a plenary trial.

A bench trial ensued in March of 1984. *See* note 1 *ante*. The district court ruled that Ven-Fuel's conduct was merely negligent (as opposed to fraudulent or grossly negligent), denied its motion to vacate the allowance of the partial summary judgment as to liability, and fixed the amount of the penalty at $783,500. Judgment in that amount entered against Ven-Fuel on March 16, 1984. The present appeal straightaway ensued.

## IV. ISSUES PRESENTED.

Ven-Fuel assigns error to the judgment below in a myriad of ways. Generally speaking, its appeal can be divided into four segments. First, it raises an inverse *Wong Sun* argument, *cf. Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963), to the effect that the poisoned tree (the fee-free license granted by Interior on the basis of the appellant's false representations) did not bear and taint the fruit of which the government now complains (the entry of residual fuel oil through Customs). Second, it asseverates that the district court was wrong in ruling that simple negligence was a sufficient predicate to invoke the imposition of liability under 19 U.S.C. § 1592. Third, Ven-Fuel lets fly a gaggle

---

days following the enactment of CPRSA) sufficed to slip this litigation within the window of prior substantive law. Therefore, only § 1592(e) modifies the prior statute for purposes of this case. The pertinent portions of the text of that provision follow:

(e) District court proceedings.—Notwithstanding any other provision of law, in any proceeding in a United States district court commenced by the United States pursuant to section 1604 of this title for the recovery of any monetary penalty claimed under this section—

(1) all issues, including the amount of the penalty, shall be tried de novo;

(2) if the monetary penalty is based on fraud, the United States shall have the burden of proof to establish the alleged violation by clear and convincing evidence;

(3) if the monetary penalty is based on gross negligence the United States shall have the burden of proof to establish all the elements of the alleged violation; and

(4) if the monetary penalty is based on negligence, the United States shall have the burden of proof to establish the act or omission constituting the violation, and the alleged violator shall have the burden of proof that the act or omission did not occur as a result of negligence.

5. The legislative history of § 1592(e) conclusively shows that Congress intended to alter the two-tiered system which allowed administrative mitigation of penalties but permitted only the draconian sanction of forfeiture in civil actions. Thus § 1592(e) was given immediate effect, applying independently even before the more specific intent, culpability, and damage provisions of § 1592(c) came into force:

For 592 [recodified as § 1592] cases which are before the courts after the date of enactment but prior to the effectiveness of revised section 592, the managers intend that, for the purpose of applying the judicial review provisions, the court will have full discretion to look at the merits of the case and make its own independent determination on the appropriate amount of the penalty and would not be bound by the old maximum penalty which was set out in the old 592. The court would not, of course, be authorized to assess a penalty *above* the maximum penalty allowable under old section 592.

S.Rep. No. 778 at 12, 1978 U.S.Code Cong. & Ad.News at 2254. Section 1592(e) did not, however, *create* negligence liability. Congress clearly believed that such liability already existed, *see* S.Rep. No. 778 at 18, 1978 U.S.Code Cong. & Ad.News at 2229, and its aim was solely to remedy and to make more flexible a perceived imbalance in the applicable sanctions. We cannot infer from the enactment of § 1592(e) alone that Congress intended to interdict any previously existing intent requirements for civil actions or specifically to enact a negligence standard (as it did in § 1592(c)). To the contrary, the premise of § 1592(e)(4), that is, the legislative assumption that existing law embodied the concept of penalties bottomed on simple negligence, furnishes strong support for our conclusion, *see* text *post* at Part VI, that the pre-1978 legislation accomplished precisely such a result.

of claims which relate to mixed questions of fact and law: it asserts, for example, that the misstatements contained in the application constituted matters of opinion rather than statements of fact; that the government induced the representations which were made, thereby giving rise to safe harbor defenses of waiver and/or estoppel; and that, in any event, Ven-Fuel's taradiddles were not "material" in contemplation of § 1592. Lastly, the appellant challenges the amount of the penalty imposed by the district court as being grossly excessive.

We have considered these contentions to the extent warranted by the record, and find Ven-Fuel's reliance upon each and all of them to be misplaced.

## V. BAD TREE—ROTTEN FRUIT.

■ Ven-Fuel offers the clever, but not unique, argument that because the license presented to Customs was regular on its face, there can be no transgression of 19 U.S.C. § 1592. This approach is, as we have noted, an inverted application of the *Wong Sun* doctrine. Stripping the argument to its bare essentials, the appellant would have us hold that so long as the importation papers themselves were unexceptionable, § 1592 does not apply; and this, despite the fact that the fee-free license, which was a condition precedent to the completion of those papers, would admittedly never have issued but for Ven-Fuel's misrepresentations to Interior. Put another way, Ven-Fuel argues that if the Customs' declarations and related paperwork were in proper form, the "mere" fact that they were premised on a license to which the importer was not legally entitled was of no consequence. This argument is an exercise in casuistry.

The caselaw is consistent in its insistence that persons should not benefit from the reasonably foreseeable results of pernicious conduct vis-a-vis the importation of goods. And, such a postulate has clearly informed the statute sub judice as well as its ancestors and its close kith and kin.

19 U.S.C. § 1592 has a long and venerable history. Its roots can be traced to the eighteenth century, viz., the Act of 1799, 1 Stat. 677. That enactment ordained in part:

That if any goods, wares or merchandise, of which entry shall have been made in the office of a collector, shall not be invoiced according to the actual cost thereof, at the place of exportation, with design to evade the duties thereupon, or any part thereof, all such goods, wares or merchandise, or the value thereof, to be recovered of the person making entry, shall be forfeited....

*Id.* at § 66.

In *Caldwell v. United States,* 49 U.S. (8 How.) 366, 12 L.Ed. 1115 (1850), the Court considered the question of whether a bona fide purchaser holding goods which in fact had been entered in violation of § 66 could be subject to a forfeiture order. The Court exhibited scant hesitation in answering that question in the affirmative:

In the first, *the forfeiture* is, *the statutory transfer of right to goods at the time the offence is committed.* If this was not so, the transgressor, against whom, of course, the penalty is directed, would often escape punishment, and triumph in the cleverness of his contrivance by which he has violated the law. The title of the United States to the goods forfeited is not consummated until after judicial condemnation; but *the right to them* relates backwards to the time the offence was committed....

*Id.* 49.U.S. (8 How.) at 381 (emphasis original).

*Caldwell* took an early stitch in what has become an omnipresent thread in the fabric of § 1592 and kindred laws. The decision represents a plain recognition of the need to construe customs laws with some breadth, so as to avoid ingenious end-runs on the collection of revenues and the control of imports.

Another landmark case of the same vintage, *Wood v. United States,* 41 U.S. (16 Pet.) 342, 10 L.Ed. 987 (1842), is illustrative of the same overriding policy considera-

tions. In *Wood,* goods were passed through Customs without incident. But, after the fact, they were seized and declared forfeit (the government having belatedly recognized deficiencies in the accompanying invoices). The *Wood* Court upheld the post hoc confiscation:

> For it can never be permitted that a party who perpetrates a fraud upon the custom-house, and thereby enters his goods upon false invoices and false valuations, and gets a regular delivery thereof upon the mere payment of such duties as such false invoices and false valuations require, can avail himself of that very fraud to defeat the purposes of justice.... The language of the sixty-sixth section ... supposes an entry at the custom-house upon false invoices with intent to evade the payment of the proper duties, and the forfeiture attaches immediately upon such an entry upon such invoices with such intent. The success of the fraud in evading the vigilance of the public officers, so that it is not discovered until after the goods have passed from their custody, does not purge away the forfeiture; although it may render the detection of the offence more difficult and more uncertain.

*Id.* 41 U.S. (16 Pet.) at 362.

The naked fact that the goods, at the time of entry, were accorded the imprimatur of the Customs officials neither held them harmless nor purified the entry as "regular on its face" or as a "true entry". Such locutions, the Court made clear, did not wash away the taint which attached to the fruit of a bad tree.

The case of *Cliquot's Champagne,* 70 U.S. (3 Wall.) 114, 18 L.Ed. 116 (1865) broadened the litany of cases which rejected the rotten fruit of a bad tree in the arboretum of the customs laws. In *Cliquot's,* the Court held that, under the 1863 version of the statute, 12 Stat. 737 (March 3, 1863), an agent's innocence was insufficient to erase the blemish of the principal's guilt. 70 U.S. (3 Wall.) at 144. The statute, which on its face appeared not to apply to those other than the persons who entered or attempted to enter the goods, was again expansively construed to strike down the invidious practice of using an "innocent" agent to run cover for a guilty principal.

*Caldwell, Wood* and *Cliquot's* collectively teach that the customs laws punish more than poorly-executed contrivance which is nipped in the point-of-entry bud; those laws similarly impugn artifice so slick that it initially succeeds in sliding the goods undetected past the watchful eyes of the custom-house.

The same principles arose in *United States v. Boyd,* 24 Fed. 692 (C.C.S.D.N.Y. 1885), *rev'd on other grounds,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), a case which is in certain respects strikingly similar to the case at bar.[6] In *Boyd,* the defendant made material misstatements regarding eligibility in an application to the Treasury Department for an import permit. The permit was issued and was then used to pass goods through the custom-house at New York. The defendant called the faulty letter a "remote cause" of the entry, 24 Fed. at 695, and, like Ven-Fuel, relied on an assertion that the permit was a true document when used at the custom-house. *Id.* The defense was summarily rejected:

> [S]uch an application there must be deemed one of the steps belonging to an attempt to enter the goods, and consequently any false paper presented, and designed by the defendant to be present-

---

6. *Boyd* was decided under the 1874 revision of the statute. The Act to Amend the Customs Revenue Laws, and to Repeal Moieties (18 Stat. 186, June 22, 1874) provided in pertinent part (§ 12):

"That any owner, importer, consignee, agent, or other person who shall, with intent to defraud the revenue, make, or attempt to make, any entry of imported merchandise by means of any fraudulent or false invoices,

affidavit, letter, or paper, or by means of any false statement, written or verbal, ... by means whereof the United States shall be deprived of the lawful duties, or any portion thereof, accruing upon the merchandise, or any portion thereof embraced or referred to in such invoice, affidavit, letter, paper, or statement, [shall be liable to forfeiture].

*Id.* at 188.

ed, to the secretary of the treasury for the purpose of obtaining the order for the free entry, cannot be considered as a remote or indirect cause only, but as the direct procuring cause of the free entry. The subsequent acts of the collector in conformity with the direction of his superior in entering the goods as free, were merely a formal compliance with what had already been determined upon the defendant's application in Washington. In effect, the attempt to enter these goods as free was made at Washington, on application to the head of the department, and not, as in ordinary cases, upon application at the custom-house here.

There is nothing in section 12 of the act of 1874 that limits its application, as regards attempts to enter goods, to proceedings at the custom-house only. The real purpose of the act, to prevent and punish frauds, as well as its general language, require [sic] it to be applied to attempts to enter goods wherever make [sic].

24 Fed. at 695–96.

Ven-Fuel's notion that *Boyd* is distinguishable on the grounds that Treasury was merely the "superior" of the customs officials is misplaced; Interior stands as just such a "superior" vis-a-vis Customs under the regulatory scheme applicable in this case. *See* text *ante* at Part I. And a number of cases construe other federal statutes similarly. *See, e.g., United States v. Beasley,* 550 F.2d 261 (5th Cir.1977) (false and fraudulent claims made to state government held to violate False Claims Act, 18 U.S.C. § 287); *United States v. Del Toro,* 513 F.2d 656 (2d Cir.), *cert. denied,* 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975) (false statements made to city held to constitute a fraud on United States); *United States v. Catena,* 500 F.2d 1319 (3rd Cir.1974) (physician presented false claims to United States through insurance companies).

It is true, as the appellant points out, that a majority of the reported cases under statutes akin to 19 U.S.C. § 1592 deal with apocryphal documents presented directly to Customs. *E.g., United States v. Twenty-Eight Packages of Pins,* 28 F.Cas. 244, 252 (C.C.D.Pa.1832) (No. 16,561). But no case, fairly read, extends the proposition further than imposing a requirement that (i) some document must be presented to Customs, in order to (ii) effect an entry of goods, which is (iii) in some material manner irregular. That requirement was wholly satisfied in this instance. A false practice occurs if the misrepresentation is made at any stage of the transaction "from the beginning to the end, anywhere." *United States v. Baker,* 24 F.Cas. 953, 956–57 (C.C.S.D.N.Y.1871) (No. 14,500). *See United States v. Mescall,* 164 Fed. 580, 583 (C.C.E.D.N.Y.1908). *Cf. United States v. One Bag of Crushed Wheat,* 166 Fed. 562 (C.C.S.D.N.Y.1908).

Ven-Fuel's restrictive reading of the statute is contradicted not only by the caselaw, but by the very language of 19 U.S.C. § 1592 (which broadly prohibits both false statements, whether written or verbal, and false practices committed in connection with the importation of goods). Section 1592 in no way limits itself to the presentation of any specific type of entry document to Customs. Instead, it prohibits the importation of merchandise by any false "invoice, declaration, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance whatsoever...." *Id.* The generality of this language plainly indicates that any false statement or practice, not just a particular genre of entry document, is within the statutory sweep. The application of § 1592 does not, therefore, depend on the form or content of the document or statement. *See United States v. Twenty-five Packages of Panama Hats,* 231 U.S. 358, 360–61, 34 S.Ct. 63, 64–65, 58 L.Ed. 267 (1913) (invoice forms contained false valuation of goods); *United States v. Felsen,* 648 F.2d 681, 684–85 (10th Cir.1981) (applying the similarly worded criminal provision, 18 U.S.C. § 542, to false statements that foreign automobiles were covered by certificates of conformity from the United States Environmental Protection Agency); *United States v. Wagner,* 434 F.2d 627, 627–28 (9th Cir.

1970) (applying 19 U.S.C. § 1592 to false statements regarding country of origin on the invoices and in the labeling of the merchandise).

The rule of *Caldwell, Wood, Cliquot's, Boyd,* and their progeny renders statutorily indigestible the putrescent fruit of Ven-Fuel's diseased tree. To read § 1592 more narrowly would be an open invitation to subversion of the legitimate aims of revenue collection and to the acquisition by importers, and those in privity with them, of ill-gotten benefits. We decline to extend or to honor any such invitation. Congress never intended that an importer be rewarded for administrative deceit by being allowed to use the very product of that breach of faith to insure the duty-free passage of goods at public expense. We hold, therefore, that Ven-Fuel's assertions in this regard are baseless.

## VI. NEGLIGENCE AS A BASIS FOR LIABILITY.

The appellant argues with some force that simple negligence was, as a matter of law, insufficient to trigger the applicable penalty provisions. And, since the district court exculpated Ven-Fuel of any more egregious conduct in the premises, we must confront this contention head on.[7]

We look first to the language of the statute itself, an enactment which is largely silent on the issue of intent. The version of the law which is applicable to the question of liability here, *see* note 4 *ante,* was born in this precise form in 1930. Recodified in 1970, it provides in its entirety as follows:

> If any consignor, seller, owner, importer, consignee, agent, or other person or persons enters or introduces, or attempts to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance whatsoever, or makes any false statement in any declaration under the provisions of section 1485 of this title (relating to declaration on entry) *without reasonable cause to believe* the truth of such statement, or aids or procures the making of any such false statement as to any matter material thereto *without reasonable cause to believe* the truth of such statement, whether or not the United States shall or may be deprived of the lawful duties, or any portion thereof, accruing upon the merchandise, or any portion thereof, embraced or referred to in such invoice, declaration, affidavit, letter, paper, or statement; or is guilty of any willful act or omission by means whereof the United States is or may be deprived of the lawful duties or any portion thereof accruing upon the merchandise or any portion thereof, embraced or referred to in such invoice, declaration, affidavit, letter, paper, or statement, or affected by such act or omission, such merchandise, or the value thereof, to be recovered from such person or person, shall be subject to forfeiture, which forfeiture shall only apply to the whole of the merchandise or the value thereof in the case or package containing the particular article or articles of merchandise to which such fraud or false paper or statement relates. The arrival within the territorial limits of the United States of any merchandise consigned for sale and remaining the property of the shipper or consignor, and the acceptance of a false or fraudulent invoice thereof by the consignee or the agent of the consignor, or the existence of any other facts constituting an attempted fraud, shall be deemed, for the purposes of this section, to be an attempt to enter such merchandise notwithstanding no actual entry has been made or offered.

19 U.S.C. § 1592 (1970) (emphasis added).

We must, at the outset, reject the analysis of the statute relied upon by the court below. The district court opined that the

---

**7.** The government has filed no cross appeal challenging the district court's determination that Ven-Fuel was guilty only of negligence as opposed to gross negligence or fraud.

"reasonable cause to believe" phrase blanketed the statute in its entirety and thereby allowed the absence of "reasonable cause to believe," i.e., negligence, to serve as a basis for liability under the act. Such an interpretation is plausible at first blush, especially when seen in light of the fact that Congress in 1978 believed that 19 U.S.C. § 1592 imposed liability for negligence: "The penalty applies to negligent as well as intentional violations...." S.Rep. No. 778, 95th Cong., 2nd Sess. 17, *reprinted in* 1978 U.S.Code Cong. & Ad.News at 2228–29. Yet, we think that the matter is not so simplistic.

■ The rule of the last antecedent is, of course, a fundamental tool of statutory construction. That rule holds generally that qualifying phrases are to be applied to the words or phrase immediately preceeding and are not to be construed as extending to others more remote. *First Charter Financial Corp. v. United States,* 669 F.2d 1342, 1350 (9th Cir.1982); *Azure v. Morton,* 514 F.2d 897, 900 (9th Cir.1975); *Quindlen v. Prudential Insurance Co.,* 482 F.2d 876, 878 (5th Cir.1973); *United States v. Pritchett,* 470 F.2d 455, 459 (D.C.Cir.1972); *Mandel Bros. v. Federal Trade Commission,* 254 F.2d 18, 22 (7th Cir.1958), *rev'd on other grounds,* 359 U.S. 385, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959). While the rule is not an inflexible one, *Pritchett,* 470 F.2d at 459, it should be applied unless there is a plain indication to the contrary in the statute. And, there is no such harbinger here.

■ 19 U.S.C. § 1592 slips neatly within the integument of the rule. The qualifying phrase "without reasonable cause to believe" must be construed to modify only the last previous antecedent phrase, viz., "any false statement in any declaration under the provisions of section 1485 of this title (relating to declaration on entry)." The modifying phrase cannot be rationally construed to refer distributively to the more remote antecedent words or phrases, which occur before the disjunctive clause set off by commas.

The validity of such an interpretation is further confirmed by the presence of the adjective "such" in the phrase "without reasonable cause to believe the truth of such statement." In the portion of § 1592 preceding this phrase, the noun "statement" appears twice, initially before the first disjunctive clause ("... or by means of any false statement, written or verbal ...") and latterly within the second "or" clause, where it is immediately followed (and qualified) by the phrase "in any declaration under the provisions of section 1485 of this title (relating to declaration on entry)." The definition of "such" in Black's Law Dictionary 1284 (5th ed. 1979), states:

> "Such" represents the object as already particularized in terms which are not mentioned, and is a descriptive and relative word, *referring to the last antecedent.* (emphasis added).

Again, we apply the rule of the last antecedent. "Such statement," in this clause, must be construed as referring only to the last prior use of the word "statement." Thus, "such statement" perforce refers only to a statement made in a formal customs declaration, and it is only that type of statement to which the phrase "without reasonable cause to believe" applies.

■ other construction would render nugatory the entire phrase: "or makes any false statement in the declaration under the provisions of section 1485 of this title." This is so because the general word "declaration" appears in the earlier clause: "by means of any fraudulent or false invoice, declaration, affidavit, letter, paper...." The unrestricted word "declaration" would, of course, include *all* types of declarations, including declarations on entry made under 19 U.S.C. § 1485. Thus, if Congress had intended the phrase, "without reasonable cause to believe the truth of such statement" to apply to statements made in declarations generally (and to statements made in invoices, affidavits, letters or papers), it would have been senseless to make any particularized reference to § 1485 declarations on entry. All words and provisions of statutes are intended to have meaning and are to be given effect, and no construction should be adopted

which would render statutory words or phrases meaningless, redundant or superfluous. *Breest v. Cunningham,* 752 F.2d 8, 9 (1st Cir.1985); *Zimmerman v. North American Signal Co.,* 704 F.2d 347, 353 (7th Cir.1983); *Wilderness Society v. Morton,* 479 F.2d 842, 856 (D.C.Cir.), *cert. denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973); *Blue Cross of Rhode Island v. Cannon,* 589 F.Supp. 1483, 1491 (D.R.I.1984). *See generally* Black, *Construction and Interpretation of Laws,* § 60 at 165 (2d ed. 1911). There is but one reason—and one reason alone—why Congress would have singled out § 1485 declarations on entry by this particularized reference: it is only such declarations to which the "without reasonable cause to believe" lanuage directly relates.

Although the district court was, for these reasons, in error in formulating the rationale upon which it determined that simple negligence was enough to trigger § 1592 liability, ascertainment of that error does not end our inquiry. The law is settled that if the court below reached the right conclusion, albeit on a faulty premise, its decision should be affirmed on appeal. *See, e.g., Securities and Exchange Commission v. Chenery Corp.,* 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943); *Doe v. Anrig,* 728 F.2d 30, 32 (1st Cir.1984); *Pueblo International Inc. v. DeCardona,* 725 F.2d 823, 825 (1st Cir.1984). So, in order to divine the meaning and intendment of the statute, and its applicability to the facts as found by the district court, it is necessary in our judgment to trace the full genealogy of 19 U.S.C. § 1592.

We commence our trek with the proceedings of the fifth Congress, from which emerged an enactment that provided in part as follows:

> That if any goods, wares or merchandise, of which entry shall have been made in the office of a collector, shall not be invoiced according to the actual cost thereof, at the place of exportation, with design to evade the duties thereupon, or any part thereof, all such goods, wares or merchandise, or the value thereof, to be recovered of the person making entry, shall be forfeited; and in every case in which the said collector shall suspect that any such goods, wares or merchandise are not invoiced at a sum equal to that for which they have usually been sold in the place or country from whence they were imported, it shall be the duty of such collector to take the said goods, wares or merchandise into his possession, and retain the same with due and reasonable care, at the risk and expense of the owner or owners, consignee or consignees thereof, until their value at the time and place of importation shall be ascertained, and until the duties arising, according to such valuation, shall be first paid, or secured to be paid, as required by this act in other cases of importation.

1 Stat. 677, § 66 (1799).

This statute, narrowly drawn and limited to invoicing situations, paid particular heed to the place of exportation. But, it did include a phrase that dealt with intent: "with design to evade." As the progenitor of a race of laws addressed to fraud on the custom-house, the 1799 statute became the object of interpretation in two crucial areas.[8] Cases decided under that hoary ordinance give us a glimpse of what kind of intent requirement Congress had in mind when it enacted § 66.

*Wood,* decided by the Court in 1842, set the tone for many of the later cases. The Court rejected any notion that the revenue collection laws were to be strictly construed, opting instead for an expansive approach to statutory interpretation in this area. *Wood,* 41 U.S. (16 Pet.) at 362–63. And, while the *Wood* Court's liberal reading and application of the statutory scheme was implemented sub silentio, the Court was more direct in its observations some three years later:

---

**8.** Two acts—one of May 28, 1830, 4 Stat. 410, and the other of July 14, 1832, 4 Stat. 593—which modified the customs revenue laws are often discussed in relation to § 66. These statutes, however, have no substantial impact on the case at hand.

Upon the point that the revenue laws, on which the information was founded, were not, as the judge in the court below suggested, to be deemed penal laws in the sense in which that phrase is sometimes used, it may be proper to say a very few words. He treated the point as not of great importance in the case, as we think it was not, since it had no tendency to change the interpretation of the provisions of the revenue laws then under his consideration. In one sense, every law imposing a penalty or forfeiture may be deemed a penal law; in another sense, such laws are often deemed, and truly deserve to be called, remedial. The judge was therefore strictly accurate, when he stated that "It must not be understood that every law which imposes a penalty is, therefore, legally speaking, a penal law, that is, a law which is to be construed with great strictness in favour of the defendant. Laws enacted for the prevention of fraud, for the suppression of a public wrong, or to effect a public good, are not, in the strict sense, penal acts, although they may inflict a penalty for violating them." And he added, "It is in this light I view the revenue laws, and I would construe them so as most effectually to accomplish the intention of the legislature in passing them." The same distinction will be found recognised in the elementary writers, as, for example, in Blackstone's Commentaries, (1 Black.Comm. 88;) and Bacon's Abridgment, (statute I. 7, 8;) and Comyns' Digest, (Parliament R. 13, R. 19, R. 20;) and it is also abundantly supported by the authorities.

*Taylor v. United States,* 44 U.S. (3 How.) 197, 210–11, 11 L.Ed. 559 (1845) (dicta).

*Wood* and *Taylor* by no means stand alone. The idea that revenue laws are a special breed, sui generis, demanding a more liberal interpretation in light of the remedial policies which they promote, is deeply rooted in our jurisprudence. Thus, the Court in *Cliquot's Champagne* applied the same analytic approach to the 1863 ancestor of § 1592, holding that:

> Revenue laws are not penal laws in the sense that requires them to be construed with great strictness in favor of the defendant. They are rather to be regarded as remedial in their character, and intended to prevent fraud, suppress public wrong, and promote the public good. They should be so construed as to carry out the intention of the legislature in passing them and most effectually accomplish these objects.

70 U.S. (3 Wall.) at 145. *See also United States v. Willetts,* 28 F. Cases 612, 614 (C.C.S.D.N.Y.1871) (No. 16,699) (Blatchford, J.). The early authorities are virtually consentient on the point.[9] And, the soundness of their reasoning cannot seriously be doubted, given the salient governmental concerns which underlie the integrity of the custom-house.

These cases tell us that, notwithstanding their penal aspects, the revenue laws are to be expansively read in order to give effect to the will of the Congress. But, they are not particularly illuminating as to how that will manifests itself vis-a-vis the degree of culpability necessary to catalyze the statutory scheme. It is on this issue that cases such as *United States v. Five Casks of Files,* 25 F.Cas. 1095 (C.C.S.D.N.Y.1840) (No. 15,112) and *Caldwell v. United States, supra,* point the way.

In the former matter, the government brought an information against merchandise allegedly imported by means of a false invoice with intent to evade or defraud revenue collection, contrary to § 4 of the Act of May 28, 1830, 4 Stat. 410. The importers argued—as Ven-Fuel argues here—that a mere mistake was insufficient

---

**9.** Only *United States v. Eighty-Four Boxes of Sugar,* 32 U.S. (7 Pet.) 453, 462–63, 8 L.Ed. 745 (1833), appears *contra.* In stating that laws imposing forfeiture were penal and should be strictly construed, however, the Court apparently meant only to hold that some intent is required for forfeiture. This is evident from the argument of counsel in the case. *Id.* 32 U.S. (7 Pet.) at 458. Consistent with the interpretation, *Sugar* makes the standard distinction between cases of fraud and situations of mere accident or mistake. *Id.* 32 U.S. (7 Pet.) at 463.

to sustain liability. Judge Betts ruled otherwise:

> [T]he claimant contends that, if W., H. & Moss supposed that they were purchasers, and, under this supposition, inserted the actual cost, instead of actual value, they were merely mistaken in the law, and not guilty of an intent to defraud or evade the revenue. The court, however, is of opinion that this mistake of the law cannot be looked to in their exculpation. They are bound to know the law, and if, without mistake of fact, they make an entry in their invoice contrary to the law, it must be regarded as intentional; and, if tending to evade or defraud the revenue, that intent must be ascribed to the false invoice. The jury are not, in this particular, to inquire as to the actual private intent to defraud the revenue, but whether the importers were in such a relation of manufacturers as bound them to enter the goods, not at actual cost, but at actual value.

*United States v. Five Casks of Files*, 25 F.Cas. at 1096.

That something less than the specific intent or scienter usually associated with acts of criminality will suffice in a customs case is also apparent from *Caldwell*. There, the court, in reviewing the district judge's jury instructions in a suit under the Act of 1799, faulted the charge for intimating that proof of "meditated fraud" was an essential element of the government's case. *Caldwell*, 49 U.S. (8 How.) at 383. *Caldwell*, both on the trial level and in the Supreme Court, equated "fraud" in the sense of the Act of 1799 with "improper means;" the case plainly indicates that the "fraud" necessary to impose liability for violation of the customs laws is, and has been from the start, a breed apart.

The nature of the intent requirement appears more clearly in *United States v. Ninety-Nine Diamonds*, 139 Fed. 961 (8th Cir.1905). There, the government sought to confiscate gems under § 9 of the Act of June 10, 1890, ch. 407, 26 Stat. 135–36. That law is a direct lineal ancestor of 19 U.S.C. § 1592.[10] It read in part as follows:

> That if any owner, importer, consignee, agent, or other person shall make or attempt to make any entry of imported merchandise by means of any fraudulent or false invoice, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance whatsoever, or shall be guilty of any willful act or omission by means whereof the United States shall be deprived of the lawful duties, or any portion thereof, accruing upon the merchandise, or any portion thereof, embraced or referred to in such invoice, affidavit, letter, paper, or statement, or affected by such act or omission, such merchandise or the value thereof, to be recovered from the person making the entry, shall be forfeited, which forfeiture shall only apply to the whole of the merchandise or the value thereof in the case or package containing the particular article or articles of merchandise to which such fraud or false paper or statement relates; ...

The Eighth Circuit, in a thorough and exhaustive opinion, recognized the duality of meaning which could be ascribed to the word "false" in the statutory context, and drew the line so as to include negligently false representations within the reach of the revenue law. The court held (139 Fed. at 966):

> The word "false" has two distinct and well-recognized meanings. It signifies (1) intentionally or knowingly or negli-

---

**10.** The provisions of the Customs Administrative Act of June 10, 1890, ch. 407, §§ 6, 9, 26 Stat. 131, 134, 135–36 were amended and reenacted by the Payne-Aldrich Tariff Act of Aug. 5, 1909, ch. 6 § 28, 36 Stat. 11, 95, 97. The Payne-Aldrich Act in turn was amended by the Underwood Tariff Act of Oct. 3, 1913, ch. 16, § III, H, 38 Stat. 114, 183–84, which was itself superseded and repealed by Act of Sept. 21, 1922, ch.

356, Title IV, §§ 592, 643, 42 Stat. 858, 982, 989–90. The 1922 Act was superseded and repealed by the Act of June 17, 1930, ch. 497, Title IV, §§ 592, 651(a)(1), 46 Stat. 590, 750–51, 762, which was later amended by Act of Aug. 5, 1935, ch. 438, Title III, § 304(b), 49 Stat. 517, 527. None of these changes altered the 1890 Act in any way material to this case.

gently untrue, and (2) untrue by mistake, accident, or honestly after the exercise of reasonable care. A statement that is false in the former sense is undoubtedly denounced by section 9.

And further (*id.* at 968–69):

The reason of the case, the general rule that penal statutes should be strictly construed, that the judiciary should not interpret into them the creation of offenses which the enacting body did not clearly denounce, and the general current of decisions upon this subject, to some of which reference has been made, indicate that the true rule is this: The words "false" and "falsely," in statutes and contracts which impose forfeitures or penalties for false acts or acts falsely done, generally imply culpable negligence or wrong. They signify more than incorrect or incorrectly, and mean knowingly or intentionally or negligently false or falsely, in the absence of express provisions in the statutes or contracts themselves, or reasonable implications from them, their subjects, and the circumstances to the contrary. (Citations omitted).

The Eighth Circuit concluded:

Section 9 of the act of 1890 is a penal statute. It prescribes grave forfeitures and penalties, and it falls fairly within the rule which has been announced, and which is sustained by the above authorities. A rational construction of the statute and a consideration of the relation of the offense of the use of a false statement denounced in it to the other offenses created by it strengthen this conclusion. It is neither probable, nor reasonable, to suppose that Congress intended to inflict the forfeiture of the merchandise involved, a possible fine of $5,000, and possible imprisonment for two years for the use of an innocent or mistaken statement that was made with reasonable care and without knowledge

that it was not true.... [T]he reasonable inference is that Congress intended that knowledge of its falsity, *or culpable negligence in ascertaining the answer to the question, whether it was true or false, should be an indispensable element of the offense* of using the false statement, under the familiar rule, "Noscitur a sociis."

*Id.* at 969–70 (emphasis supplied).

While more modern caselaw on the subject is scanty, it favors an application of the same principles of construction to 19 U.S.C. § 1592. The Ninth Circuit, for example, upheld a forfeiture under § 1592 predicated upon a finding below that "[t]he claimant made false statements in the entry papers ... without reasonable cause to believe the truth of such statements." *United States v. Wagner*, 434 F.2d 627, 628 (9th Cir.1970). *Wagner* dealt with the exact statutory verbiage which was before the district court in the case at bar. The court of appeals flatly rejected the notion that "knowing intent" was a prerequisite to the application of the statute. *Id.* at 628–29.[11]

To the same effect is *United States v. R.I.T.A. Organics*, 487 F.Supp. 75 (N.D.Ill. 1980). That case, like the instant one, involved a proceeding under 19 U.S.C. § 1592, as enacted in 1930, wherein the government alleged that the defendant made false statements in connection with the importation of certain merchandise. The district court held squarely that the statute imposes liability "without regard to whether the importer's culpability is based upon fraud, negligence, or gross negligence." *Id.* at 76. Thus, § 1592 "makes actionable negligent, as well as fraudulent, misstatements at the time of the importation of merchandise." *Id.* at 77.

In addition to the "awkward locution" of *Jen Dao Chen*, discussed *ante* at note 11, Ven-Fuel relies on a trilogy of musty cases which, in its somewhat myopic view, re-

---

**11.** The appellant's reliance on an earlier Ninth Circuit case, *Jen Dao Chen v. United States*, 385 F.2d 939 (9th Cir.1967), for a contrary rule is misplaced. The *Wagner* court specifically considered the *Chen* precedent, and, although ac-

knowledging *Chen's* use "of the term 'intent' as being somewhat awkward in this context," *Wagner*, 434 F.2d at 629, carefully reconciled *Chen* with the *Wagner* rule.

quire a showing of intent to defraud. But, as we shall see, none of these three decisions bears the weight of the appellant's assertion.

*United States v. 1,150½ Pounds of Celluloid*, 82 Fed. 627 (6th Cir.1897) involved a forfeiture under § 9 of the Customs Administrative Act of June 10, 1890, ch. 407, 26 Stat. 135. There was no evidence of either negligence or fraud on the part of the owner, and the district court ordered the proceeds from the sale of the seized celluloid to be paid over to the claimant. The United States appealed, making essentially a strict liability argument. In rejecting the government's assignment of error, the Sixth Circuit, *id.* at 630, quoted with approval the following passage from the opinion in *Six Hundred and Fifty-One Chests of Tea v. United States*, 22 F.Cas. 253, 256 (C.C.S.D.N.Y.1826) (No. 12,916), *aff'd*, 25 U.S. (12 Wheat.) 486, 6 L.Ed. 702 (1827).

> I am not aware of a single instance where, by any positive provision of the revenue laws, a forfeiture is incurred, that it does not grow out of some fraud, mistake, or *negligence* of the party on whom the penalty has been visited. (Emphasis supplied).

Closely read, *Celluloid* stands only for the accepted proposition that an innocent bevue, without more, will not incur the wrath of the custom-house. And, *Celluloid*'s reliance upon *Chests of Tea* strongly suggests that its precedential value favors the appellee's position in the case at bar.

Ven-Fuel next brandishes the Second Circuit's decision in *United States v. Seventy-Five Bales of Tobacco*, 147 Fed. 127 (2d Cir.1906). In *Tobacco*, Judge Coxe did little more than to restate the "honest mistake" rule; *Tobacco* affirmed a directed verdict in the owner's favor in circumstances where the district court had exonerated the owner of negligence, specifically stating that the government sought to "require a degree of care and accuracy in making up the invoice which seems unreasonable." *Id.* at 129. That is negligence language—it emphatically erases the artificial gloss which the appellant attempts to place on the case. And, the smoke that Ven-Fuel sees in *Tobacco*'s dicta is further dispelled by *Tobacco*'s express reliance on *Ninety-Nine Diamonds, supra. Tobacco*, 147 Fed. at 130.

Lastly, appellant points to *United States v. One Silk Rug*, 158 Fed. 974 (3d Cir. 1908). But, the case is less an Aubusson than an imperfect remnant. To the extent that *One Silk Rug* holds to the view that the forfeiture provisions of the customs laws must be judged by the same standard as applies to the criminal prosecution of a person charged with effecting a fraudulent entry, *id.* at 976, it is simply wrong-headed. There is no respectable authority to support such an extreme perspective, and the *One Silk Rug* court cites to none. Be that as it may, the issue in the case is much narrower than Ven-Fuel would have us believe. The Third Circuit described the issue there at bar as follows:

> The learned trial judge took the position that the fraud on the part of the foreign broker would not support a forfeiture of the goods unless this fraud was subsequently adopted by the person making entry of the goods, and that *if such person were innocent there was no ground for forfeiture.* The position of the government is, on the contrary, as indicated in the exceptions filed, to the effect that, under section 9 of the customs administrative act, the entry of goods by means of a fraudulent invoice put into existence by the seller and shipper of the merchandise, and who is financially interested in defeating the customs, is sufficient to forfeit the goods when entry is made on this invoice....

*Id.* at 976 (quoting government's brief) (emphasis supplied).

Thus, despite the use of intent-oriented language, reminiscent of the "awkward locution" of *Jen Dao Chen, see* note 11 *ante, One Silk Rug* is, at bottom, but one further proof that some blameworthy conduct fairly attributable to the owner/importer of the goods must attach in order to invoke penalty liability.

That Congress intended to punish for negligence is evident from legislative actions and history surrounding the adoption of the 1930 Act. At that time, Congress memorialized administrative practice surrounding the customs revenue laws by enacting § 618, which read in pertinent part:

> Whenever any person interested in any vessel, vehicle, merchandise, or baggage seized under the provisions of this Act, or who has incurred, or is alleged to have incurred, any fine or penalty thereunder, files with the Secretary of the Treasury if under the customs laws, and with the Secretary of Commerce if under the navigation laws, before the sale of such vessel, vehicle, merchandise, or baggage a petition for the remission or mitigation of such fine, penalty, or forfeiture, the Secretary of the Treasury, or the Secretary of Commerce, if he finds that such fine, penalty, or forfeiture was incurred without willful negligence or without any intention on the part of the petitioner to defraud the revenue or to violate the law, or finds the existence of such mitigating circumstances as to justify the remission or mitigation of such fine, penalty, or forfeiture, may remit or mitigate the same upon such terms and conditions as he deems reasonable and just, or order discontinuance of any prosecution relating thereto.

Section 618 plainly allowed the Secretary of the Treasury to mitigate fines and penalties if they had been imposed on a lower level of culpability than "wilfull negligence." That proviso alone leaves no room to doubt that Congress intended and envisioned that simple negligence could itself support the imposition of such penalties; elsewise, the authority ceded to the Secretary to mitigate or reduce would be an empty exercise.

The debates surrounding the adoption of that section demonstrate beyond cavil that Congress intended to give statutory authority to long-standing administrative practice. As Senator Howell noted, "[W]e have given to the Secretary of the Treasury the power to exercise his discretion and to relieve to such extent as he may deem proper the fine which has been levied and to collect it. That has ever been an executive function under the Constitution of the United States, and we are continuing it in an executive function here as it has been for some time in the past." *See* 72 Cong.Rec. S4714 (1929) (remarks by Sen. Howell and Sen. Shortridge); *see also* 72 Cong.Rec. S3848–52 (1929) (remarks on various administrative cases). The express authorization to punish for negligence in § 618 evidences, we think, congressional intent to utilize a similar standard for § 1592. The statutes, after all, must be read in *pari passu*. The Secretary was not required—only permitted—to mitigate or remit a forfeiture penalty in cases of negligence; it would be anomalous to allow the Secretary to assess a fine predicated upon negligence but be unable to enforce that fine in a civil action; it would be equally anomalous to prohibit, in a case of negligence, a civil action for forfeiture directly, yet allow the Secretary to impose such a remedy administratively. It is obvious that in enacting the 1930 version of the act, from which the 1970 version of § 1592 was transplanted, Congress assumed—and therefore, intended—that negligence was sufficient to constitute the requisite platform of intent adequately to bottom liability.[12]

Though we have faulted the district judge for her literal reliance on the "without reasonable cause to believe" clause contained in § 1592, *see* text *ante* at 750–752, her instincts were good. Despite the

---

**12.** *See* 72 Cong.Rec. S4333 (1929) (remarks by Sen. Blaine). In debating furniture and antique schedules, Senator Blaine made these passing remarks: "If we are going to apply a penalty, it ought not to be applied where the party acted innocently and without knowledge and without reasonable grounds to believe that his purchased article was spurious and fraudulent."

The senator's remarks, from which there was no dissent, display the unique sense of falsity or fraud in the customs revenue context. The notion encompasses anything more blameworthy than accident or innocent mistake. Consistent with the preexisting caselaw, "negligently untrue" practices fall within the encincture. *Cf. Ninety-Nine Diamonds,* 139 Fed. at 966.

solecism, the language (which is quite probably superfluous, in the final analysis) does inform the statute as a whole. Again, we must lift the historical veil.

Decades ago, § 6 of the Payne-Aldrich Tariff Act of August 5, 1909, 36 Stat. 95, dealt specifically with false statements made under a customs declaration. A more general provision of the same statute, § 9, covered false and fraudulent practices or appliances, etc. 36 Stat. 97. Unlike § 9—in which, as we have seen, the blameworthiness requirement had historically been implicit in the statutory language—§ 6 contained an express intent requirement.

Congress amended these sections in 1913, Act of October 3, 1913, 38 Stat. 183–84. In so doing, Congress effectively consolidated § 6 and § 9 of the 1909 Act under a single rubric, deleted the word "knowingly" from the former § 6, and inserted the "without reasonable cause to believe" verbiage in its stead. While the legislative history of this philological merger is unenlightening for our purposes, the only reasonable illation which we can draw is that Congress sought to match the intent requirements of the former §§ 6 and 9. And, to do so demanded the softening of the § 6 phraseology to the "without reasonable cause to believe" level, akin to the minimum showing of negligence which had historically sufficed to energize § 9 culpability. Seen in the albedo of these evolutionary changes, the presence of the "without reasonable cause to believe" language in 19 U.S.C. § 1592 (1970), though not blanketing the entire statute, is an easily-read signpost which points unerringly to our conclusion that negligence can and should be an adequate foundation for a finding of penalty liability.

■ If any doubt remains as to the reach of 19 U.S.C. § 1592, it can be set to rest by reviewing the proceedings of the Congress in 1978, when the statute was redrafted. "[W]hile the views of subsequent Congresses cannot override the unmistakable intent of the enacting one ... such views are entitled to significant weight ... and

particularly so when the precise intent of the enacting Congress is obscure." *Seatrain Shipbuilding v. Shell Oil,* 444 U.S. 572, 596, 100 S.Ct. 800, 814, 63 L.Ed.2d 36 (1980) (citations omitted). *See Andrus v. Shell Oil,* 446 U.S. 657, 666 n. 8, 100 S.Ct. 1932, 1938 n. 8, 64 L.Ed.2d 593 (1980); *cf. Red Lion Broadcasting v. Federal Communications Commission,* 395 U.S. 367, 380–81 & n. 8, 89 S.Ct. 1794, 1801–02 & n. 8, 23 L.Ed.2d 371 (1969). As we have recently observed:

> Although subsequent legislative history is less authoritative than contemporaneous explanation, subsequent Congressional declaration of an act's intent is entitled to great weight in statutory construction.

*Roosevelt Campobello International Park Commission v. United States Environmental Protection Agency,* 711 F.2d 431, 436–37 (1st Cir.1983).

When the Congress faced up to the need to revise § 1592, it left no doubt as to its understanding of its former enactment:

> The penalty under Section 592 [19 U.S.C. § 1592] applies without regard to the degree of culpability. The penalty of forfeiture value may be applied to a violation occurring as a result of simple negligence.

S.Rep. No. 778, 95th Cong., 2nd Sess. 1, *reprinted in* 1978 U.S.Code Cong. & Admin.News 2211, 2213. *See also id.* at 17, 1978 U.S.Code Cong. & Admin.News at 2224–29 (penalties apply "to negligent as well as intentional violations").

That view was confirmatory of widespread preexisting administrative practice imposing penalties for negligent conduct, *id.,* a practice which all of the commentators had believed to be consistent with the statute in its 1930–1978 incarnation. *E.g.,* Herzstein, *The Need to Reform Section 592 of the Tariff Act of 1930,* 10 Int'l Law. 285 (1976); Note, *Anachronism Laid to Rest: Customs Reform Act Accomplishes Long Overdue Reform of Section 592 of the Tariff Act of 1930,* 10 Law & Pol'y Int'l Bus. 1305 (1978). Our search of the textual authorities reveals no expression of any

opposite view, and the appellant has cited us to none.

■ Nor does the application of such a penalty for negligence strike a dissonant chord in terms of our jurisprudence generally. The Court has long stressed the remedial purposes of the customs laws and the necessity for expansive, commonsense construction so as to effectively promote the public weal. *E.g., Cliquot's Champagne,* 70 U.S. (3 Wall.) at 145; *Taylor,* 44 U.S. (3 How.) at 210–11 (dicta). It is hornbook law that remedial legislation is to be fairly and reasonably construed so as to effectuate the apparent legislative purpose. *E.g., United States v. Stowell,* 133 U.S. 1, 12, 10 S.Ct. 244, 245, 33 L.Ed. 555 (1890).

Neither can it be argued that the levying of a civil penalty for carelessness alone is somehow alien to the American way. For a cogent analogy, we need look no further than another, more familiar revenue collection measure, the Internal Revenue Code. Congress there has made explicit what was implicit in the pre-1978 version of 19 U.S.C. § 1952: that monetary sanctions will lie for simple negligence. *E.g.,* I.R.C. § 6653 (1954 & West Supp.1984). And, the courts have consistently upheld such an impost. *See, e.g., Lysek v. Commissioner of Internal Revenue,* 583 F.2d 1088, 1094 (9th Cir. 1978); *Abrams v. United States,* 449 F.2d 662, 664 (2d Cir.1971); *cf. Druker v. Commissioner of Internal Revenue,* 697 F.2d 46, 52–56 (2d Cir.1982). In both instances, the compelling public interest in assuring strict compliance with legislation designed equitably to fuel the engines of a democratic government (which runs, like any business, on energy derived in part from gross receipts) constitutes, in and of itself, good reason to hold the citizenry to a comparatively rigorous standard of compliance.

Just as good faith is no defense to a charge of civil contempt, *McComb v. Jacksonville Paper,* 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949); *Donovan v. Enterprise Foundry,* 751 F.2d 30, 38 (1st Cir.1984); *Fortin v. Commissioner of Massachusetts Department of Public Welfare,* 692 F.2d 790, 796 (1st Cir.1982), so the

absence of malevolent intent need not bar the application of a § 1592 penalty when Congress has adequately evinced a contrary intention. The importance of securing compliance with the order of a court, *e.g., McComb, supra,* or of an arm of the Executive Branch, *e.g., Enterprise Foundry, supra,* nicely parallels the importance of securing due observance of the Customs laws and protecting the public fisc against losses sustained by reason of noncompliance.

■ To sum up, from 1799 forward the revenue laws have sounded a consistent theme: the will of Congress, as expressed in a long line of successive statutes, has been to excuse honest mistakes and accidental incursions upon the custom-house, but to condemn, in one form or another, more blameworthy violations. Historically, simple negligence has been deemed sufficiently culpable to fall within the latter category. The caselaw, while spotty, has tended to honor this distinction. The commentators, though sometimes critical of the harshness of the rule, have uniformly recognized its vitality. And, there are good and sufficient policy considerations which favor such an approach. We therefore follow the Eighth Circuit's reading of this statute's ancestor and join the Ninth Circuit (albeit for somewhat different reasons) in holding that the district court's finding of negligence was enough to trigger the appellant's liability under 19 U.S.C. § 1592 (1970).

## VII. MISCELLANEOUS LIABILITY QUESTIONS.

### A. *Fact versus Opinion.*

Ven-Fuel asserts that it represented no false facts, but at most included in its permit application incorrect opinions. And, by analogy to tort law, the appellant argues that the mere expression of opinion, though ill-founded, cannot constitute a false misrepresentation. *See* 37 Am. Jur.2d, *Fraud and Deceit,* § 45 (1968). Ven-Fuel characterizes the palpably untrue portions of its application as being no more than the sum of Arellano's opinions and

interpretations. This line of defense is, however, doubly flawed.

■ We have scrutinized the record below, and find no sign that the appellant raised this point in any manner before the district court. Under "our consistent practice ... a new game [cannot] be started at this date." *Cohen v. President and Fellows of Harvard College,* 729 F.2d 59, 60–61 (1st Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 233, 83 L.Ed.2d 161 (1984). Except under the most extraordinary circumstances (not present here), we have regularly eschewed initial consideration at the appellate level of theories "alien to the record," *United States v. Kobrosky,* 711 F.2d 449, 457 (1st Cir.1983), and we hew to that line in this instance. The failure of the appellant to ignite this blaze below extinguishes the ustulation for purposes of this proceeding. *Cohen, supra; Kobrosky, supra; Eagle-Picher Industries v. Liberty Mutual Insurance,* 682 F.2d 12, 22 n. 8 (1st Cir.1982), *cert. denied,* 460 U.S. 1028, 103 S.Ct. 1280, 75 L.Ed.2d 500 (1983); *Johnston v. Holiday Inns,* 595 F.2d 890, 894 (1st Cir.1979).

In any event, whatever embers remain of the appellant's argument are quickly doused by an examination of the application itself. Assuming arguendo that expressions of opinion are held to a more lenient standard than statements of fact for purposes of 19 U.S.C. § 1592 (a proposition which it is not necessary for us to decide in the case at bar, and as to which we offer no view), it is starkly apparent that the application called for expressions of fact and that Ven-Fuel was obligated to respond in a factual manner. Ven-Fuel had neither a deepwater terminal under its operational control nor a throughput agreement with a deepwater terminal operator; it was, therefore, ineligible for the largesse of a fee-free license. Arellano was fully apprised of all of the relevant factual ele-

ments of the situation. Ven-Fuel was ineligible for an allocation and fee-exempt license to import residual fuel oil into the United States; the district court so found and the appellant concedes as much. When Arellano, acting for Ven-Fuel, certified that the corporation was eligible for the fee-free license, that certification was, in our opinion, utterly false as a matter of fact.[13]

### B. *Estoppel.*

The appellant claims that the government's action against it ought to be foreclosed inasmuch as "Ven-Fuel's problems were a direct result of misleading, ambiguous and conflicting information disseminated by the government." Appellant's Brief at 30. Ven-Fuel's asseveration in this regard centers around a series of inartfully-phrased letters from the federal Energy Office, bulletins issued by that agency on February 4, 1974 and February 15, 1974, and the publication on February 11, 1974 of proposed regulations, Proposed Rules Amending Oil Import Regulation 1 (Revision 5), 39 Fed.Reg. 5193 (1974), which were ultimately abandoned.

■ We need not discuss this evidence in detail. First, though estoppel was properly pleaded by the appellant as an affirmative defense, it failed entirely to proffer any argument on the point when the district court adjudicated liability. It is settled law that, when confronted with a Rule 56 motion for *brevis* disposition, a party invoking the doctrine of estoppel must advance the issue in appropriate fashion. *Burke v. Gateway Clipper, Inc.,* 441 F.2d 946, 948–49 (3rd Cir.1971); 6 J. Moore, *Moore's Federal Practice* § 56.17[21] (2d ed. 1982). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of his pleading...." Fed.R.Civ.P. 56(e).

---

**13.** It cannot be doubted that Ven-Fuel is, in this regard, grasping feebly at the frailest of straws. Not only did Arellano, in the application, certify falsely that the corporation was "eligible for such an allocation," but he likewise certified that "its qualified terminal inputs of residual fuel oil into its deepwater terminals during the period January 1, 1973 and ending December 30, 1973 were 2,740 b/d average barrels per day at 60° F." In fact, Ven-Fuel did not even have a deepwater terminal in 1973.

To be sure, when Ven-Fuel attempted after the penalty phase trial to vacate the summary judgment on liability, it did argue the estoppel theory. It did not suggest— then or now—that all of the proof on the question was not before the district court. Judge Zobel carefully examined the relevant evidence, *e.g.*, R.A. 536–37, and reaffirmed her finding on liability. R.A. 548. And, her rejection of the appellant's estoppel claim was by no means clear error.

■ As we have repeatedly held in a variety of contexts, the "traditional doctrine of equitable estoppel does not apply fully in cases against the government." *Akbarin v. Immigration and Naturalization Service*, 669 F.2d 839, 842 (1st Cir. 1982). At a minimum, the party raising the defense must have reasonably relied on some "affirmative misconduct" attributable to the sovereign. *Id.*[14] The rationale for the rule is clear: we are, after all, a nation ruled by laws not by men. The possibility of harm to a private party inherent in denying equitable estoppel its wonted reach is often (if not always) grossly outweighed by the pressing public interest in the enforcement of congressionally mandated public policy. *Best v. Stetson*, 691 F.2d 42, 44–45 (1st Cir.1982); *Portmann v. United States*, 674 F.2d 1155, 1167 (7th Cir.1982). Such considerations are peculiarly appropriate here, given the strong national interest in the integrity of the custom-house and in thwarting circumvention or honeycombing of the customs laws. *Cf. Air-Sea Brokers, Inc. v. United States*, 596 F.2d 1008, 1011 (C.C.P.A.1979) (estoppel not available in cases involving collection of import duties).

■ Viewed most charitably to the appellant, the record in this case demonstrates a certain vagueness and lack of artistry on the part of Interior's bureaucracy. But, neither carelessness, *Simon v. Califano*, 593 F.2d 121, 123 (9th Cir.1979), nor a reluctance to be of assistance, *Lavin*

*v. Marsh*, 644 F.2d 1378, 1384 (9th Cir. 1981), are tantamount to affirmative misbehavior. The evidence in this record in no way presented so compelling a case as to suggest affirmative misconduct, or as to intimate that Ven-Fuel could even begin to meet the heavy burden which it bore in this wise. *See Heckler*, 104 S.Ct. at 2224–26; *Immigration and Naturalization Service v. Miranda*, 459 U.S. at 19, 103 S.Ct. at 283; *Schweiker v. Hansen*, 450 U.S. 785, 788–90, 101 S.Ct. 1468, 1470–72, 67 L.Ed.2d 685 (1981); *Lerner v. Gill*, 751 F.2d 450, 458–459 (1st Cir.1985).

Likewise, the evidence is overwhelming that, to the extent (if at all) that Ven-Fuel relied on the somewhat sloppy actions of the government, such reliance was totally unreasonable. Arellano admitted that he never took the trouble to review the applicable regulations. And, he submitted the application in early March of 1974, despite having been advised by the Federal Energy Office that "[f]inal regulations will be promulgated before the March 15 filing date"; that "no ... applications should be filed until the comments on the proposed rulemaking published in the Federal Register, February 11, 1974 have been received and final Regulations have been published"; and that, if necessary, an extension of the March 15 filing date would be granted. Had the appellant abided by these instructions, the ambiguity of which it now complains would have vanished.

### C. Materiality.

■ Relying on the "by means of" clause embodied in 19 U.S.C. § 1592, the appellant argues that liability cannot attach under the statute absent a showing of materiality. A number of cases have engrafted such a requirement upon the statute's criminal counterpart, viz., 18 U.S.C. § 542. *See, e.g., United States v. Teraoka*, 669 F.2d 577, 579 (9th Cir.1982); *United States v. Ven-Fuel, Inc.*, 602 F.2d 747, 753 (5th

---

**14.** Even if both of these elements are present (and, in this case, they are not), it is uncertain that the government should be estopped. *Heckler v. Community Health Services of Crawford County*, —— U.S. ——, 104 S.Ct. 2218, 2224, 81

L.Ed.2d 42 (1984); *Immigration and Naturalization Service v. Miranda*, 459 U.S. 14, 19, 103 S.Ct. 281, 283, 74 L.Ed.2d 12 (1982) (per curiam); *Akbarin*, 669 F.2d at 842.

Cir.1979); *United States v. Rose*, 570 F.2d 1358, 1363 (9th Cir.1978). No case has been cited to us which imposes a similarly stringent materiality requirement—or any materiality requirement at all, for that matter—under § 1592; and our research has revealed none such. The district court questioned the authority of *Teraoka* in this circuit based on our decision in *United States v. Murray*, 621 F.2d 1163 (1st Cir.), *cert. denied*, 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44 (1980), and held, in any event, that the *Teraoka* rule, applied to the facts at bar, did not insulate Ven-Fuel from liability. Judge Zobel noted:

> Here the importation of oil by the defendants *was* achieved by means of a false statement. But for the falsity, defendants never would have received a fee-free license. It is irrelevant that the oil could have been imported by someone else. The language of § 1592 speaks to the relationship between an importer and his or her merchandise. Even under *Teraoka* the but for test must be applied in the context of this relationship.

*United States v. Ven-Fuel, Inc.*, C.A. No. 80–335–Z, slip op. at 7 (D.Mass. Oct. 6, 1982) (footnote omitted).

We agree with the court below that, even if *Teraoka* applies, Ven-Fuel is nevertheless snared by the § 1592 net. So, we need not resolve at this time any perceived conflict between *Teraoka* and *Murray*.

The appellant argues that the "by means of" language in § 1592 serves to limit the grasp of the statute to those situations in which importation of the goods in question would not have been allowed but for the false practice or statement. Insofar as this contention suggests that § 1592 would only apply where prohibited merchandise was imported, *e.g.*, 19 U.S.C. § 1307 (entry of imports manufactured by slave labor barred), it is entirely baseless. Such a restrictive reading would largely eviscerate the statute, rendering it meaningless in the vast majority of cases. And, even under 18 U.S.C. § 542, criminal convictions have reg-

ularly been sustained where generically importable goods had been entered by trick or artifice. *E.g.*, *Murray, supra* (false statements as to value and country of origin of glue); *United States v. Brown*, 456 F.2d 293 (2d Cir.), *cert. denied*, 407 U.S. 910, 92 S.Ct. 2436, 32 L.Ed.2d 684 (1972) (fraudulent undervaluation of telephones).[15]

Once it is accepted that the only logical reading of § 1592 extends the reach of the statute to false statements and practices anent lawfully importable merchandise, *e.g.*, *United States v. Twenty-Five Packages of Panama Hats*, 231 U.S. 358, 34 S.Ct. 63, 58 L.Ed. 267 (1913) (civil forfeiture provision applies to attempted entry of misvalued headgear); *United States v. Wagner, supra* (§ 1592 covers apocryphal statements regarding origin of artificial limbs); *United States v. Santini*, 266 Fed. 303 (2d Cir.1920) (action to recover forfeiture value of quilts accompanied by bogus invoices); *United States v. F.A.G. Bearings Corp.*, No. 83–9–01314, slip op. 84–109 at 12–13 (Ct. Int'l. Trade Oct. 4, 1984) (§ 1592 extends to misdescription of ball bearings and other components), the correctness of the district court's conclusion is inescapable.

The Fifth Circuit, in *United States v. Ven-Fuel, Inc., supra* (a case which we find factually distinguishable from Ven-Fuel's present plight), observed that materiality is to be "applied as an objective test of the significance of a fact to the transaction under consideration," and requires "a reasonable showing of the potential effects of the statement." 602 F.2d at 753. The government's case in the instance sub judice facilely meets even this rigorous standard. Given that the oil could not have been imported without a permit, the means which Ven-Fuel employed to obtain its ill-gotten license became the means by which it imported the merchandise. Under "an objective test," Arellano's lies were significant in that they led directly and inexorably to the issuance of the license, and thereafter to the preferential fee-free entry of

---

**15.** Indeed *Rose, supra,* relied on by the appellant, affirmed a conviction under 18 U.S.C.

§ 542 involving importation of a non-prohibited dutiable item. 570 F.2d at 1364.

the oil. The potential effect of the misstatement was, in this case, one and the same as its actual effect. In the absence of such chicanery, the duty-exempt transaction could not have occurred.[16]

Ven-Fuel has yet another string to its materiality bow. It suggests that, due to the shortage of fuel oil which plagued the nation in 1974, other importers had a surfeit of fee-free allocations and that Ven-Fuel "could have used the tickets of some other importer, either free of charge or at a modest cost per barrel." Appellant's Brief at 37. Thus, the Ven-Fuelian thesis runs, if the appellant had not finagled the fee-free license, it would have induced a lawful holder of such a permit to front the entry of the merchandise. But, this argument is too cute by half. It overlooks the ban against the sale, assignment, or transfer of an allocation or license which existed in 1974. *See, e.g.,* 32A C.F.R. Ch. X, § 12(e) (1974). To say that a misrepresentation is immaterial because the culprit could have accomplished the same result by breaking yet another law is a proposition more suitable to Lewis Carroll than to the lexicon of federal statutory interpretation.[17] And, even apart from such an obvious rejoinder, a defendant must be judged by what it has done, not by what it might have done. Ven-Fuel's argument is akin to a shoplifter, apprehended in the act, laying claim to a right of exoneration by producing sufficient funds to show that, had he chosen not to steal, he could have paid full value for the merchant's wares.

The appellant's negligently-made false statement was sufficiently material to its illicit importation of residual fuel oil into the United States to sustain the district court's imposition of fault.

## VIII. DAMAGES.

We have considered and repulsed the appellant's main assaults upon the district court's adverse liability finding. Its remaining forays on this front are uniformly meritless and we reject them without further discussion. We turn now to Ven-Fuel's final challenge: that the verdict below was grossly excessive and should be set aside.

In this case, the entered value of the illegally imported oil was $9,366,506; its domestic value was some $2,500,000 more. If Ven-Fuel had complied with the applicable laws, it would have paid the government $296,956.80 in duties in 1974. The penal award was in the sum of $783,500, and judgment was entered below in that amount on March 16, 1984.

■ The standard which we apply in reviewing the fixing of a civil penalty by the district court is the "clearly erroneous" standard of Rule 52(a). *See, e.g., Woods v. United States,* 724 F.2d 1444, 1451 (9th Cir.1984); *Safer v. Perper,* 569 F.2d 87, 100 (D.C.Cir.1977); *Neal v. Saga Shipping,* 407 F.2d 481, 487–88 (5th Cir.), *cert. denied,* 395 U.S. 986, 89 S.Ct. 2143, 23 L.Ed.2d 775 (1969). We must examine whether the penalty assessed is so harsh that there is an "inherent disproportion between the of-

**16.** In our view, this holding is consistent with *Teraoka,* inasmuch as the Ninth Circuit recognized that the making of false statements to avoid a conditional—as opposed to an absolute—ban on entry would, even for purposes of 18 U.S.C. § 542, satisfy the "by means of" requirement. *See Teraoka,* 669 F.2d at 579 (§ 542 attaches to transgression of provisions which operate either "to deny entrance of goods or to impose terms upon which entry is granted"). Presidential Proclamation 4210 established precisely this sort of conditional prohibition as to residual fuel oil.

**17.** One is reminded of Alice who, upon tumbling into the rabbit hole and finding the door to the garden locked, decided to solve her dilem-

ma by eating a piece of cake. " 'Well, I'll eat it,' said Alice, 'and if it makes me grow larger, I can reach the key; and if it makes me grow smaller, I can creep under the door; so either way I'll get into the garden, and I don't care which happens!' " L. Carroll, *Alice's Adventures In Wonderland,* 8–9 (Delacorte Press ed. 1966). After enjoying the repast, "she was quite surprised to find that she remained the same size: to be sure, this is what generally happens when one eats cake; but Alice had got so much into the way of expecting nothing but out-of-the-way things to happen, that it seemed quite dull and stupid for life to go on in the common way." *Id.* at 9.

fense and punishment." *Grover v. United States*, 200 Ct.Cl. 337, 353 (1973) (quoting *Heffron v. United States*, 186 Ct.Cl. 474, 485, 405 F.2d 1307, 1312–13 (1969)). Doubts are to be resolved in favor of the trial court, which heard the evidence and had the best opportunity to extract the true flavor of the controversy; as with the assessment of damages by a jury, we will stay our hand so long as the penalty falls "within the universe of possible awards that are supported by the evidence." *Clark v. Taylor*, 710 F.2d 4, 14 (1st Cir. 1983). And, like a jury verdict, the dollar amount of the judgment below should stand unsullied unless it is "grossly excessive," "inordinate," "shocking to the conscience of the [reviewing] court," or "so high that it would be a denial of justice to permit it to stand." *McDonald v. Federal Laboratories*, 724 F.2d 243, 246 (1st Cir. 1984), quoting *Grunenthal v. Long Island R.R.*, 393 U.S. 156, 159 & n. 4, 89 S.Ct. 331, 333 & n. 4, 21 L.Ed.2d 309 (1968).

We approach this inquiry conscious of the deference which is due to the judgment of the district court, and mindful, withal, that though negligent, Ven-Fuel has been exonerated of both fraud and gross negligence.

▇▇▇▇▇ Inasmuch as the district judge failed to articulate the method by which she computed the penalty,[18] we must view the award in its various perspectives. The statute provides that the civil penalty may not exceed twenty percent of the dutiable value of the merchandise. 19 U.S.C. § 1592(c)(3)(B) (1978). Since "dutiable value" is the functional equivalent of "entered value,"[19] the maximum penalty applicable

to Ven-Fuel's transgression was $1,873,301.20. Set against this backdrop, Judge Zobel's levy of a negligence penalty of slightly more than forty percent of the statutory maximum does not seem so disproportionate to the offense as to shock—or even to vellicate—our collective conscience.

This is particularly true when one considers certain additional factors. The oil import program was put in place not as just another tariff law, but by the express affirmative exercise of presidential power to "take such action ... as [the President] deems necessary ... so that such imports will not threaten to impair the national security." 19 U.S.C. § 1862(b). *See* Presidential Proclamation No. 3279, *supra*. As such, the national interest in honest, good faith compliance with the regulations was heightened. And, the public benefit to be derived from keeping the sharks at bay was great. It follows inexorably that any breach of the integrity of the program deserved to be treated more sternly than a garden-variety sort of commercial peccadillo.

Lastly, in the oil industry as elsewhere in the world of commerce, time equates with money. If Ven-Fuel had played by the rules, it would have paid the government slightly under $300,000 in duties in 1974. If interest were to accrue on the principal amount of the duties as of the start of 1975 at the prime rate (national average), compounded annually, the resultant total would, as the government has pointed out, be upwards of $800,000 as of March, 1984 (when the judgment was entered below).[20]

---

18. Though not fatal in this case, appellate review is, in such circumstances, clearly facilitated by a concise statement of the court below as to the ingredients which it used in concocting the penalty-setting ragout. We strongly commend such a practice to the district courts in future cases.

19. The Customs Service determines dutiable value through its own appraisal of the value of the merchandise. 19 U.S.C. § 1503. The price for the merchandise when it was sold for exportation to the United States is the critical element. *See* 19 U.S.C. § 1401a. The importer's purchase

price is listed on the entry documents as the entered value of the merchandise.

20. The following table limns the calculation. For the first eight years, the table uses the prime rate as published in Bureau of the Census, U.S. Department of Commerce, the *Statistical Abstract of the United States 1984*, 521 (104th ed. 1983). For 1983 and the first quarter of 1984, the table uses the prime rate reported by the Research Department of the Federal Reserve Bank of Boston. We take judicial notice of these rates as matters of historical fact. Fed.R. Evid. 201.

Thus, the district court's fashioning of the penalty roughly corresponds to at least one measure of the monetary gain secured by the appellant in consequence of its evasion of the tariff.

We find no inherent imbalance between the offense and the punishment in this case. The amount of the penalty, though substantial, is neither inordinately high nor traumatizing to the judicial conscience. It falls at the upper end of, but within, the universe of sustainable awards. There was no abuse of the trial court's discretion.

## IX. CONCLUSION.

We find each and all of the appellant's protestations to be meritless. The judgment of the district court, both as to Ven-Fuel's liability and as to the dollar amount of the civil penalty, rests on solid legal footing. Accordingly, the judgment is

*Affirmed. Costs in favor of the appellee.*

BREYER, Circuit Judge (dissenting).

Once the majority proves that the statute's "reasonable cause to believe" language does not apply to this defendant, the case (in my view) is over, for the *other* words in the statute do not punish *negligent* activity. Those other words (*see* Appendix A) descend directly from an act passed by Congress in 1890 (*see* Appendix B), as the majority acknowledges, *see ante*, at n. 10. Section 9 of the 1890 statute made the substantive offense grounds for both forfeiture and *imprisonment* for up to two years. And, several cases interpreting the words of section 9 specifically indicated that they require a criminal intent. *United States v. Seventy-Five Bales of Tobacco*, 147 Fed. 127, 130 (2d Cir.1906) ("Proof which is sufficient to uphold a forfeiture ... is also sufficient to justify a conviction, fine and imprisonment.... Manifestly, [the Act] was not intended to apply to mistakes or errors in judgment but to acts ... which plainly indicate a willful and culpable intent to defraud the government of its lawful revenues. Fraud, whether the action be criminal or civil, must be proved; ... this is elementary."); *United States v. One Silk Rug*, 158 Fed. 974, 976 (3d Cir.1908) ("[The] forfeiture clause requires a guilty scienter and ... criminal intent.... [I]f to properly construe the criminal clause we must, by reference, read into it the forfeiture provision coupled with a guilty intent, we must not exclude such intent when we enforce that clause to forfeit."); *United States v. 1,150 ½ Pounds of Celluloid*, 82 Fed. 627, 633–34 (6th Cir.1897) (forfeiture provisions should not lightly be interpreted to dispense with "mens rea" requirement of "criminal intent"); *United States v. One Bag of Crushed Wheat*, 166 Fed. 562, 567 (S.D.N.Y.1908) ("The goods must not be taken away from [the owner] unless he has been guilty of an intent to defraud the revenues of the United States."); *see also United States v. Ninety-Nine Diamonds*, 139 Fed. 961, 969 (8th Cir.1905) ("It is neither probable, nor reasonable, to sup-

| YEAR | PRIME RATE (%) | AMOUNT ($) |
| --- | --- | --- |
| | | 296,956.80 |
| 1975 | 7.86 | 320,297.60 |
| 1976 | 6.84 | 342,205.96 |
| 1977 | 6.83 | 365,578.63 |
| 1978 | 9.06 | 398,700.05 |
| 1979 | 12.67 | 449,215.35 |
| 1980 | 15.27 | 517,810.53 |
| 1981 | 18.87 | 615,521.38 |
| 1982 | 14.86 | 706,987.86 |
| 1983 | 10.79 | 783,271.85 |
| 1984 (1st qtr.) | 11.07 | 804,968.48 |

Ven-Fuel's argument that compounding is not permitted in, say, the calculation of prejudgment interest in a tort case, *e.g., Fox v. Kane-Miller Corp.*, 398 F.Supp. 609, 652 (D.Md.1975), *aff'd*, 542 F.2d 915 (4th Cir.1976), and thus should not be considered here, completely misses the mark. We are not at this juncture construing a statute or a rule of practice; rather, we are called upon to make a commonsense judgment as to the reasonableness of a penalty in relation to a wrong. We are not so divorced from reality that we can ignore the facts (i) that sophisticated corporations routinely invest surplus funds at rates equal to (and often in excess of) prime, with the benefit of compounding daily (let alone annually), and (ii) that, on the flip side of the coin, the cost of borrowing such an amount in 1974, with no amortization for a decade, would demand an interest rate probably in excess of variable prime and with a regular compounding of the liability for accrued interest.

pose that Congress intended to inflict the forfeiture of the merchandise involved, a possible fine of $5,000, and possible imprisonment for two years for the use of an innocent or mistaken statement that was made with reasonable care and without knowledge that it was not true."), *cert. denied*, 201 U.S. 645, 26 S.Ct. 760, 50 L.Ed. 903 (1906).

The principle underlying these cases is as valid today as it ever was, namely that courts should not interpret a criminal statute to impose liability without fault, nor should they rest criminal liability upon mere negligence, without a reasonably clear indication that Congress so intended. *Compare 3 Sutherland Statutory Construction* §§ 59.01–59.04 (C. Sands 4th ed. 1974) *with United States v. 1,150 ½ Pounds of Celluloid*, 82 Fed. at 634 (citing Sutherland, *Statutory Construction* §§ 346–407 (1st ed.)). *See generally* Hart, *The Aims of the Criminal Law*, 23 Law & Contemp. Probs. 400 (1958).

The single statutory provision of 1890 was later modified and bifurcated into two separate sections—one imposing criminal liability, and the other forfeiture—but civil and criminal penalties continued to be triggered by identical predicate offenses (*see* Appendix C, *compare* Appendix A), and the legislative history reveals no intent to broaden the scope of the specific language taken verbatim from section 9 of the 1890 Act. H.R.Rep. No. 5, 63d Cong., 1st Sess. XLIV–XLV. (By contrast, that same passage of H.R.Rep. No. 5 announced that Congress did intend to broaden the scope of *other* sections of the 1890 Act, namely, those activities to which the "reasonable cause to believe" clause directly applies. *Id.* As the majority concedes, that clause is inapplicable here. *See also ante*, at n. 10.) Thus, before 1978 only the "reasonable cause to believe" clause embodied a negligence standard; the 1978 statutory change came too late to apply to this defendant.

The majority's reasons for importing a negligence standard into the statute's other words do not convince me. The majority points to a statement in one of the relevant '1890 statute' cases, *United States v. Ninety-Nine Diamonds*, that those other words mean "knowingly or intentionally or negligently false," 139 Fed. at 968. But the word "negligently" here is at best pure dictum, for the court was busily engaged in showing that the statute did not impose strict liability and invoking rules of strict construction to do so. In fact, the preceding sentence in *Ninety-Nine Diamonds* and the following page make it clear that when the court says "negligently" it means *"culpable* negligence"—a term in context referring to recklessness or gross negligence or some form of aggravated behavior. The court said,

> The use of a false statement invokes the same punishment and is enumerated in the same section with the use of a "fraudulent or false invoice, affidavit, letter, paper," and the guilt of a "willful act or omission." As the willful act or omission and the offense of the fradulent invoice, affidavit, letter, or paper could not be committed without knowledge or a reckless disregard of the means of knowledge, the reasonable inference is that Congress intended that knowledge of its falsity, or culpable negligence in ascertaining the answer to the question, whether it was true or false, should be an indispensable element of the offense of using the false statement....

139 Fed. at 969–70.

The other three '1890 statute' cases cited by the majority use language that states still more clearly the statute's requirement of a criminal state of mind. *See United States v. One Silk Rug, supra; United States v. 1,150 ½ Pounds of Celluloid, supra; United States v. Seventy-Five Bales of Tobacco, supra. See also United States v. One Bag of Crushed Wheat, supra.* And, the case of *United States v. Wagner*, 434 F.2d 627 (9th Cir.1970), upon which the majority also relies, dealt with an application of the "reasonable cause to believe" clause, which is inapplicable here.

The majority also relies on congressional statements, made in 1930 and 1978, which

reflect a belief that the statute imposes liability for negligence. Many of these statements should be understood as simply referring to the "reasonable cause to believe" clause (which does impose liability for negligence where it applies). Sometimes congressmen, like the court below, do suggest that the "reasonable cause to believe" language applies literally to the entire statutory section. But, the court today rejects that view. Thus, there is nothing in the congressional debates to help it.

Finally, the court refers to considerable pre-1870 history and language suggesting a broad construction of customs statutes. Before 1870, however, the statute did not impose criminal liability; and it is the initial appearance of the relevant language in a criminal statute that triggers the relevant strict principles of construction and makes irrelevant the 'broad' customs statute interpretive canon. Regardless of the case law under *earlier* statutes, courts contemporaneously interpreting the 1890 Act were unanimous in saying that it was penal, and should therefore be strictly construed. *United States v. 1,150 ½ Pounds of Celluloid*, 82 Fed. at 634 ("The statute under consideration is highly penal, and as such falls within the general rule which requires a strict construction."); *United States v. Ninety-Nine Diamonds*, 139 Fed. at 964 ("But a penal statute which creates and denounces a new offense should be strictly construed."); *United States v. Seventy-Five Bales of Tobacco*, 147 Fed. at 130 ("Such a statute must be strictly construed.").

Since the statute has been amended, and the case therefore has little precedential value, I shall say no more, but leave to the reader with an historical bent the task of examining the cases and legislative history I have cited to determine which reading is correct. Here I simply note my disagreement insofar as the court departs from the principle of strict construction, and my consequent disagreement with the result.

### APPENDIX A

§ 1591. Fraud; personal penalties.

If any consignor, seller, owner, importer, consignee, agent, or other person or persons enters or introduces, or attempts to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance whatsoever, or makes any false statement in any declaration under the provisions of section 1485 of this title (relating to declaration on entry) without reasonable cause to believe the truth of such statement, or aids or procures the making of any such false statement as to any matter material thereto without reasonable cause to believe the truth of such statement, whether or not the United States shall or may be deprived of the lawful duties, or any portion thereof, accruing upon the merchandise, or any portion thereof, embraced or referred to in such invoice, declaration, affidavit, letter, paper, or statement; or is guilty of any willful act or omission by means whereof the United States shall or may be deprived of the lawful duties, or any portion thereof, accruing upon the merchandise, or any portion thereof, embraced or referred to in such invoice, declaration, affidavit, letter, paper, or statement, or affected by such act or omission, such person or persons shall upon conviction be fined for each offense a sum not exceeding $5,000, or be imprisoned for a time not exceeding two years, or both, in the discretion of the court: *Provided,* That nothing in this section shall be construed to relieve imported merchandise from forfeiture by reason of such false statement or for any cause elsewhere provided by law. (June 17, 1930, ch. 497, title IV, § 591, 46 Stat. 750; Aug. 5, 1935, ch. 438, title III, § 304(a), 49 Stat. 527.)

§ 1592. Same; penalty against goods.

If any consignor, seller, owner, importer, consignee, agent, or other person or persons enters or introduces, or attempts to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper,

or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance whatsoever, or makes any false statement in any declaration under the provisions of section 1485 of this title (relating to declaration on entry) without reasonable cause to believe the truth of such statement, or aids or procures the making of any such false statement as to any matter material thereto without reasonable cause to believe the truth of such statement, whether or not the United States shall or may be deprived of the lawful duties, or any portion thereof, accruing upon the merchandise, or any portion thereof, embraced or referred to in such invoice, declaration, affidavit, letter, paper, or statement; or is guilty of any willful act or omission by means whereof the United States is or may be deprived of the lawful duties or any portion thereof accuring upon the merchandise or any portion thereof, embraced or referred to in such invoice, declaration, affidavit, letter, paper, or statement, or affected by such act or omission, such merchandise, or the value thereof, to be recovered from such person or persons, shall be subject to forfeiture, which forfeiture shall only apply to the whole of the merchandise or the value thereof in the case or package containing the particular article or articles of merchandise to which such fraud or false paper or statement relates. The arrival within the territorial limits of the United States of any merchandise consigned for sale and remaining the property of the shipper or consignor, and the acceptance of a false or fraudulent invoice thereof by the consignee or the agent of the consignor, or the existence of any other facts constituting an attempted fraud, shall be deemed, for the purposes of this section, to be an attempt to enter such merchandise notwithstanding no actual entry has been made or offered. (June 17, 1930, ch. 497, title IV, § 592, 46 Stat. 750; Aug. 5, 1935, ch. 438, title III, § 304(b), 49 Stat. 527.)

Taken from 19 U.S.C. §§ 1591–92 (1940) (now superseded).

## APPENDIX B

SEC. 9. That if any owner, importer, consignee, agent, or other person shall make or attempt to make any entry of imported merchandise by means of any fraudulent or false invoice, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance whatsoever, or shall be guilty of any willful act or omission by means whereof the United States shall be deprived of the lawful duties, or any portion thereof, accruing upon the merchandise, or any portion thereof, embraced or referred to in such invoice, affidavit, letter, paper, or statement, or affected by such act or omission, such merchandise, or the value thereof, to be recovered from the person making the entry, shall be forfeited, which forfeiture shall only apply to the whole of the merchandise or the value thereof in the case or package containing the particular article or articles of merchandise to which such fraud or false paper or statement relates; and such person shall, upon conviction, be fined for each offense a sum not exceeding five thousand dollars, or be imprisoned for a time not exceeding two years, or both, in the discretion of the court. *Penalty for making, etc, false entry.*

Taken from Customs Administrative Act of June 10, 1890, ch. 407, § 9, 26 Stat. 135–36.

## APPENDIX C

"G. That if any consignor, seller, owner, importer, consignee, agent, or other person or persons, shall enter or introduce, or attempt to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance whatsoever, or shall make any false statement in the declarations provided for in paragraph F without reasonable cause to believe the truth of such statement, or shall aid or procure the making of any such false statement as to any matter material thereto without reasonable cause to believe the truth of such statement, or shall be guilty of any willful act or omission by means whereof the United States shall or may be deprived of the lawful duties, or any portion thereof, accruing upon the merchan- *Punishment for attempts to enter by false invoice, etc. Vol. 36, p. 97, amended. Ante, p. 182.*

dise, or any portion thereof, embraced or referred to in such invoice, declaration, affidavit, letter, paper, or statement, or affected by such act or omission, such person or persons shall upon conviction be fined for each offense a sum not exceeding $5,000, or be imprisoned for a time not exceeding two years, or both, in the discretion of the court: *Provided,* That nothing in this section shall be construed to relieve imported merchandise from forfeiture by reason of such false statement or for any cause elsewhere provided by law.

*Proviso.*
Forfeiture not affected.

"H. That if any consignor, seller, owner, importer, consignee, agent, or other person or persons shall enter or introduce, or attempt to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance whatsoever, or shall make any false statement in the declarations provided for in paragraph F without reasonable cause to believe the truth of such statement, or shall aid or procure the making of any such false statement as to any matter material thereto without reasonable cause to believe the truth of such statement, or shall be guilty of any willful act or omission by means whereof the United States shall or may be deprived of the lawful duties or any portion thereof, accruing upon the merchandise or any portion thereof, embraced or referred to in such invoice, declaration, affidavit, letter, paper, or statement, or affected by such act or omission, such merchandise, or the value thereof, to be recovered from such person or persons, shall be forfeited, which forfeiture shall only apply to the whole of the merchandise or the value thereof in the case or package containing the particular article or articles of merchandise to which such fraud or false paper or statement relates. That the arrival within the territorial limits of the United States of any merchandise consigned for sale and remaining the property of the shipper or consignor, and the acceptance of a false or fraudulent invoice thereof by the consignee or the agent of the consignor, or the existence of any other facts constituting an attempted fraud, shall be deemed, for the purposes of this paragraph, to be an attempt to enter such merchandise notwithstanding no actual entry has been made or offered.

Forfeiture of goods for making false invoices, statements, etc.

*Ante,* p. 182.

Extent of forfeiture.

Attempt to make false entry construed.

Taken from the Underwood Tariff Act of Oct. 3, 1913, ch. 16, § III, G, H, 38 Stat. 183–84.